IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RONALD C. FAGAN, M.D., P.C., et al.    *

    Plaintiffs    *    Civil Case No. 23-cv-02095-TJS

v.    *

U.S. DEPARTMENT OF HEALTH    *
AND HUMAN SERVICES, et al.
    *

    Defendants

    *

\* \* \* \* \* \* \* \* \*

**<u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

    The Provider Relief Fund was Created from the CARES Act................................................... 2

    PRF Recipients were Required to Submit Reports. ................................................................. 3

    Non-Compliance with the Terms and Conditions Meant PRF Funds May Need to be
    Returned. ................................................................................................................................... 4

    Plaintiffs Failed to Report, so the Agency Recouped Plaintiffs' PRF payments...................... 5

    HHS Submitted an Information Collection Request Pursuant to the Paperwork Reduction Act
    concerning the PRF Payment Reporting Requirement. ............................................................ 5

ARGUMENT ........................................................................................................................... 6

STANDARD OF REVIEW ..................................................................................................... 6

  I.    PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM UNDER THE APA.............. 7

    A.   The PRF Terms and Conditions Are Not Subject to APA's Notice-and-Comment
       Procedures................................................................................................................... 7

       1.   The PRF Terms and Conditions Were Not Legislative in Nature........................ 7

       2.   Section 553(a)(2) Exempted the PRF Terms and Conditions from Rulemaking
            Requirements................................................................................................... 12

    B.   The Paperwork Reduction Act Governed the PRF Reporting Requirement – Not the
       Administrative Procedure Act. ................................................................................... 15

  II.   ASSUMING THE APPLICABILITY OF THE APA, THE CHALLENGED ACTIONS
      ARE NOT SUBJECT TO JUDICIAL REVIEW. .......................................................... 18

    A.   Implementation of PRF Payments is Similar to Actions Traditionally Committed to
       Agency Discretion. ..................................................................................................... 18

    B.   Congress Gave the Secretary Discretion to Implement PRF Reporting.................... 19

  III.  PLAINTIFFS FAIL TO STATE A PLAUSIBLE PROCEDURAL DUE PROCESS
      CLAIM. ............................................................................................................................ 21

IV.  PLAINTIFFS FAIL TO STATE A PLAUSIBLE SEVENTH AMENDMENT CLAIM. 22

V.  PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM FOR VIOLATION OF THE APPOINTMENTS CLAUSE. ........................................................................................ 25

VI.  PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM AGAINST THE TREASURY DEFENDANTS. ............................................................................................................ 28

CONCLUSION ................................................................................................................................ 30

Pursuant to Fed R. Civ. P 12(b)(6), the Department of Health and Human Services ("HHS"), Xavier Becerra, Secretary of Health and Human Services, Health Resources and Services Administration ("HRSA"), Carole Johnson, Administrator of HRSA, (collectively, the "Agency") and the U.S. Department of the Treasury, Janet Yellen, Secretary of the Treasury, Bureau of the Fiscal Service, Sandra Paylor Sanders, Assistant Commissioner of the Bureau of Fiscal Service (collectively, "Treasury") move to dismiss the Second Amended Complaint because Plaintiffs have failed to state a claim upon which relief may be granted.

## INTRODUCTION

Plaintiffs, Ronald C. Fagan M.D. PC ("Dr. Fagan"), All Family Medicine PC ("All Family"), and Coastal Ear, Nose & Throat Surgeons PLC ("Coastal ENT"), Michael R. Wiesner DDS APDS ("Wiesner"), Jeremy T. Sharp PHD LLC ("Sharp"), and Mahyar Tahbaz ("Tahbaz"), received Provider Relief Fund ("PRF") payments from the federal government pursuant to the Coronavirus, Aid, Relief and Economic Security Act ("CARES Act"). They were asked, repeatedly, to comply with basic reporting requirements contemplated by Congress to ensure compliance with the conditions of payment and otherwise prevent fraud and abuse. Plaintiffs accepted the payments, agreed to comply, but failed to comply notwithstanding ample notice of the reporting requirement and numerous opportunities to report after the deadline.

In response to the Agency asking Plaintiffs to return the funds based on their failure to report, Plaintiffs sued under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq*. ("APA") and alleged procedural due process violations, as well as violations of the Seventh Amendment and Appointments Clause. The APA, however, does not apply because: (1) the challenged conduct—recoupment for failure to satisfy the conditions of payment—was not legislative in nature; (2) even if the recoupment term was legislative in nature, 5 U.S.C. § 553(a)(2) exempts

agency contracts from the APA's notice-and-comment requirements; and (3) the Paperwork Reduction Act, not the APA, governed the PRF reporting requirement.  Even assuming the applicability of the APA, Plaintiffs have failed to demonstrate that the challenged conduct is subject to judicial review.  As for Plaintiffs' procedural due process claim, Plaintiffs do not allege a protectible property interest and cannot state a claim.  Plaintiffs' Appointments Clause argument fares no better given control held by the Secretary of Health and Human Services over the Public Health Service, including the Health Resources and Services Administration and its Administrator.

Plaintiffs' lawsuit includes claims against Treasury in connection with Treasury's efforts to collect the debts determined by the Agency to be owed by Plaintiffs when Plaintiffs neither reported, nor returned their PRF payments.  Yet, Treasury has no statutory role in certifying Plaintiffs' debts or determining whether their debts should be offset.  Treasury performs a ministerial, mandatory, non-discretionary duty, and is the wrong party when a debtor wants to challenge the collection action.  Plaintiffs' Seventh Amendment claim likewise does not withstand scrutiny as costs charged by the Agency for debt collection services are not civil monetary penalties triggering Seventh Amendment trial-by-jury protections.

## BACKGROUND

**The Provider Relief Fund was Created from the CARES Act.**

On March 27, 2020, in the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136, Title VIII, 134 Stat. 281, 563 (Mar. 27, 2020), Congress appropriated $100 billion to the Public Health and Social Services Emergency Fund "to reimburse, through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus."  Pub. L. No. 116-136, 134 Stat. 281 (2020).  Through the Paycheck Protection Program and Health Care Enhancement Act ("PPPHCEA") and the

Consolidated Appropriations Act, 2021 ("CAA"), Congress increased appropriations to the Public Health and Social Services Emergency Fund by $78 billion for the same purposes. Pub. L. No. 116-139, 134 Stat. 620 (2020); Pub. L. No. 116-260, 134 Stat. 1182 (2020). The Provider Relief Fund ("PRF") was created from these funds. October 9, 2024 Second Am. Compl., ECF No. 55 ("SAC") ¶ 33. To be eligible for a PRF payment, a health care provider had to "provide diagnoses, testing, or care for individuals with possible or actual cases of COVID-19." *See* CARES Act, 134 Stat. at 563. The CARES Act also required that funds "not be used to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse." CARES Act, 134 Stat. at 563.

The Agency was charged with the primary role of distributing the Provider Relief Fund. SAC ¶ 39. The CARES Act required the Agency to make payments "in consideration of the most efficient payment systems practicable to provide emergency payment." *See* CARES Act, 134 Stat. at 563. On April 10, 2020, HHS used readily available Medicare claims data as a basis for initial distributions under "Phase 1" of the PRF's general distribution. *See* SAC ¶¶ 42, 44. After the initial Phase 1 distributions, additional PRF distributions were made in 2020 and 2021. *Id*. ¶ 45.

**PRF Recipients were Required to Submit Reports.**

The CARES Act and subsequent statutes provided recipients of PRF payments "*shall* submit reports and maintain documentation *as the Secretary determines* are needed to *ensure compliance with conditions* that are imposed by [the CARES Act] for such payments, and such reports and documentation *shall* be in such form, with such content and in such time *as the Secretary may prescribe* for such purpose." *Id*. at 563 (emphasis added); PPPHCEA, 134 Stat. at 622-23; CAA, 134 Stat. at 1920.

As such, the April 10, 2020 Terms and Conditions included a term on reporting:

3

> The recipient shall submit reports as the Secretary determines are needed to ensure compliance with conditions that are imposed on this Payment, and such reports shall be in such form, with such content, as specified by the Secretary in future program instructions directed to all Recipients.

SAC ¶ 51.[1]  This specific Term and Condition aligned with the explicit statutory requirement that PRF recipients "*shall submit reports* and maintain documentation *as the Secretary determines* are needed *to ensure compliance with conditions*…."  CARES Act, 134 Stat. at 563 (emphasis added).

**Non-Compliance with the Terms and Conditions Meant PRF Funds May Need to be Returned.**

On April 10, 2020, HHS issued a press release concerning the PRF distributions, advising PRF recipients, including Plaintiffs:

> Within 30 days of receiving the payment, providers must sign an attestation confirming receipt of the funds and agreeing to the terms and conditions of payment.

SAC ¶ 50.  HHS later extended the deadline.  *Id*. ¶ 52.  HHS also advised, "The funds do not need to be repaid if certain terms and conditions are met."  *Id*., Exhibit 5a-ii, FAQ (ECF No. 55-5 at 15).  In other words, "[i]f a provider meets certain terms and conditions, the payments received do not need to be repaid at a later date."  *Id*., Exhibit 5a-ii, FAQ (ECF No. 55-5 at 19).  For the sake of clarity, the Agency published the following FAQ and answer:

> **Do I have to pay this back?**
> Retention and use of funds are subject to certain terms and conditions.  If these terms and conditions are met, payments do not need to be repaid at a later date.

---

[1] For the purposes of this Motion to Dismiss, Defendants primarily refer to the Terms and Conditions attached to the Second Amended Complaint.  However, the version of the Terms and Conditions attested to by each Plaintiff varied and are available by internet archive.  *See, e.g.,* May 4, 2020 Terms and Conditions, https://web.archive.org/web/20200504165508/https://www.hhs.gov/sites/default/files/terms-and-conditions-provider-relief-30-b.pdf (last visited Nov. 22, 2024), see Exhibit 2; June 20, 2020 Terms and Conditions, https://web.archive.org/web/20200620142512/https://www.hhs.gov/sites/default/files/terms-and-conditions-provider-relief-30-b.pdf (last visited Nov. 22, 2024), see Exhibit 3.

*Id.*, Exhibit 5a-ii, FAQ (ECF No. 55-5 at 19).

The Agency made clear that the provider's acceptance and use of funds was subject to the Terms and Conditions, and failure to abide by the Terms and Conditions could result in the provider needing to return the funds. The Agency re-emphasized this requirement in Terms or Conditions issued on or about April 20, 2020:

> Your commitment to full compliance with all Terms and Conditions is material to the Secretary's decision to disburse these funds to you. Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payment made from the Relief Fund. These Terms and Conditions apply directly to the recipient of payment from the Relief Fund.

Terms and Conditions on or about April 20, 2020, https://web.archive.org/web/20200420175652/https://www.hhs.gov/sites/default/files/relief-fund-payment-terms-and-conditions.pdf (last visited Nov. 22, 2024), see Exhibit 1.[2]

**Plaintiffs Failed to Report, so the Agency Recouped Plaintiffs' PRF payments.**

Each of the Plaintiffs received PRF payments, accepted the Terms and Conditions, but failed to submit the required reports. *See id.* ¶¶ 62, 82, 84, 86, 88, 89, 91, 93. As such, the Agency sough to recoup Plaintiffs' PRF payments. *See id.* ¶ 7, 83, 85, 87, 88, 90, 92, 94.

**HHS Submitted an Information Collection Request Pursuant to the Paperwork Reduction Act concerning the PRF Payment Reporting Requirement.**

---

[2] Plaintiffs discuss the Terms and Conditions throughout the Complaint and therefore they are incorporated by reference and available for the Court's consideration on a Rule 12(b)(6) motion. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (When reviewing a motion to dismiss, court may "consider documents that are explicitly incorporated into the complaint by reference," "those attached to the complaint as exhibits," and "a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity."). Documents are integral to the complaint when the plaintiff "has relied upon these documents in framing the complaint." *Am. Chiropractic v. Trigon*, 367 F.3d 212, 234 (4th Cir. 2004). The court may also take judicial notice of matters of public record. *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

Generally, the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501 *et seq*., requires an agency to, among other things, obtain clearance from the Office of Management and Budget ("OMB") before collecting certain information from the public.  However, under Section 319(f) of the Public Health Service Act, the Secretary of HHS may authorize the waiver of PRA requirements during a public health emergency.  Here, the Agency sought a waiver of the PRA requirements to initiate reporting and later sought OMB clearance to continue reporting.  *See* 86 Fed. Reg. 40064.

On July 26, 2021, HRSA announced in the Federal Register that it "plans to submit an Information Collection Request (ICR)" to OMB and sought "comments from the public regarding the burden estimate [] or any other aspect of the ICR" concerning PRF payment reporting.  *See* 86 FR 40064.  The notice explained:

> Providers who have accepted the Terms and Conditions regarding their PRF payment(s), including the requirement that the provider 'shall submit reports as the Secretary determines are needed to ensure compliance with conditions that are imposed on this Payment … will be using the PRF Reporting Portal to submit information about their use of PRF payments.

86 Fed. Reg. 40064.

The Notice further explained that "Recipients of a PRF payment agreed to a set of Terms and Conditions, which, among other requirements, mandate compliance with certain reporting requirements that will facilitate appropriate oversight of recipients' use of funds" and the information collected will allow for "assessing whether recipients have met statutory and programmatic requirements." *Id*.

## ARGUMENT

### STANDARD OF REVIEW

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal

sufficiency of the complaint. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's "'[f]actual allegations must be enough to raise a right to relief above the speculative level,'" thereby "'nudg[ing] their claims across the line from conceivable to plausible.'" *Aziz v. Alcolac, Inc*., 658 F.3d 388, 391 (4th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)) (correction in original). "At bottom, determining whether a complaint states on its face a plausible claim for relief and therefore can survive a Rule 12(b)(6) motion will 'be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief . . . ." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679) (internal quotation marks omitted) (correction in original).

## I. PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM UNDER THE APA.

### A. The PRF Terms and Conditions Are Not Subject to APA's Notice-and-Comment Procedures.

Plaintiffs incorrectly assert that the PRF Terms and Conditions are legislative rules, and thus procedurally invalid for lack of notice-and-comment procedures. The PRF Terms and Conditions were not subject to the APA's notice-and-comment requirements because (1) the terms and conditions were not legislative in nature and (2) 5 U.S.C. § 553(a)(2)'s exemption applies, carving out the PRF Terms and Conditions from rulemaking requirements.

#### 1. The PRF Terms and Conditions Were Not Legislative in Nature.

The APA establishes the procedures federal agencies use for "rulemaking," defined as the process of "formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). "Rule," in turn, is defined broadly to include "statement[s] of general or particular applicability and future effect"

that are designed to "implement, interpret, or prescribe law or policy." *Id.* § 551(4). The APA requires that all "rules" be issued through a statutorily prescribed notice-and-comment process. *See* 5 U.S.C. § 553(a)-(c). "Rules issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the 'force and effect of law.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03, (1979)). "[A] rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Children's Hospital of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018) (internal quotation marks and alteration omitted).

On the other hand, "interpretive rules simply state what the administrative agency thinks a statute means, and only remind affected parties of existing duties." *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1340-41 (4th Cir. 1995); *see also Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) ("Interpretative rules are those that clarify a statutory or regulatory term, remind parties of existing statutory duties, or merely track preexisting requirements and explain something the statute or regulation already required." (internal quotation marks omitted)). The APA provides that, unless another statute states otherwise, the notice-and-comment requirement "does not apply" to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A).

However, the line between interpretive rules and "legislative" or "substantive" rules is notoriously difficult to discern. *See Perez*, 575 U.S. at 96 (the term "interpretive rule" is "not further defined by the APA, and its precise meaning is the source of much scholarly and judicial debate"); *Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc) ("[T]he distinction between legislative and nonlegislative rules has been described as enshrouded

in considerable smog." (internal quotation marks and citation omitted). "[T]he critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'")). *Perez*, 575 U.S. at 97 (citation omitted)). Conversely, a legislative rule "creates new law or imposes new rights or duties" or "expand[s] the footprint of a regulation by imposing new requirements, rather than simply interpreting the legal norms Congress or the agency itself has previously created." *Children's Hosp. of the King's Daughters, Inc.,* 896 F.3d at 620 (alteration in original and citations omitted).

Here, Congress expressly mandated the reporting term, providing PRF recipients "shall submit reports and maintain documentation as the Secretary determines are needed…." CARES Act, 134 Stat. at 563. Indeed, Plaintiffs acknowledge the reporting requirement's statutory origins, *see* SAC ¶ 36.

As for recoupment, the PRF Terms and Conditions made clear that the provider's acceptance and use of PRF funds was subject to the Terms and Conditions, including the requirement to submit reporting, and failure to abide by the Terms and Conditions could result in recoupment:

> Your commitment to full compliance with all Terms and Conditions is material to the Secretary's decision to disburse these funds to you. Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payment made from the Relief Fund. These Terms and Conditions apply directly to the recipient of payment from the Relief Fund.

Terms and Conditions on or about April 18, 2020, Exhibit 3. Plaintiffs do not dispute their receipt of the PRF funds or their attestation of the Terms and Conditions. *See generally* SAC ¶¶ 82, 84, 86, 89, 91, 93.

The recoupment of funds for failure to submit required reports stems from the reporting requirement in the CARES Act. Congress mandated reporting to ensure that PRF recipients

satisfied the statutory conditions for PRF payments.  In fact, the funds were to go to "eligible healthcare providers" for "health care related expenses or lost revenues that are attributable to coronavirus."  *See* CARES Act, 134 Stat. at 563.  Indeed, the CARES Act provided that recipients of payments "*shall submit reports* and maintain documentation as the Secretary determines are needed *to ensure compliance* with conditions that are imposed by [the CARES Act] for such payments…."  *Id*. (emphasis added).  If a condition of payment was not satisfied, it is a reasonable interpretation of the CARES Act that the provider could not retain the payment.  *See id*.

Indeed, any other interpretation would render meaningless the statutorily prescribed conditions for payment and explicit instruction to the Secretary of HHS to implement reporting to verify compliance.  *See Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 214-16 (1995) (noting that effect must be given, if possible, to every word, clause, and sentence of a statute).  When evaluating the Medicare program, the court in *U.S. ex rel. Westmoreland v. Amgen, Inc*., 812 F. Supp. 2d 39, 59 (D. Mass. 2011) determined that "compliance with the Anti–Kickback Statute is an implied but nonetheless definitive precondition of government payment" under Medicare.  The court added, "[t]o hold that the Secretary cannot require information from providers with respect to this firmly established precondition would be to undercut his broad discretion as to what information to require as a condition of payment to providers under the Medicare program."  *Id*. (citations omitted).  So too, here, satisfaction of the conditions of payment is an implied condition to retention of PRF payments under the CARES Act, and the Secretary sought to verify such preconditions as mandated by Congress and take appropriate action for noncompliance.

The United States Bankruptcy Court for the Western District of Texas recently held as much with respect to the Provider Relief Fund in *In Re: BR Healthcare Solutions, LLC*, No. 20-50627 (October 6, 2021), 2021 WL 4597761.  The issue before the bankruptcy court involved

whether the debtor (a non-operational skilled nursing facility that had withdrawn from the Medicare program) was an eligible health care provider for receipt of PRF funds. *Id*. at *3-*4. The court determined that the "Terms and Conditions make clear the provider must be enrolled in Medicare to receive funds" and because the debtor was terminated as a Medicare provider, the debtor was not eligible to receive PRF funds. *Id*. at *5. Because the debtor was not an eligible health care provider, the bankruptcy court ordered the debtor to return the PRF funds. *Id*.

There is no "considerable smog" here; the recoupment term was not a legislative rule. It did not "alter the rights or interests of parties," *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000), or "impose any new legal obligation" on participating providers, *United Source One, Inc. v. USDA, Food Safety & Inspection Serv*., 865 F.3d 710, 717 (D.C. Cir. 2017), *cert. denied sub nom. United Source One, Inc. v. USDA*, 138 S. Ct. 1332 (2018), because Congress intended only for eligible providers to retain PRF payments and required reporting as a check on compliance.

Recoupment and safeguarding of PRF payments are consistent with the responsibilities of executive agencies under the Constitution, statutory principles, and common law. U.S. CONST. art. I, § 9, cl. 7 and art. IV, § 3, cl. 2; 31 U.S.C. § 1301(a); 31 U.S.C. § 3711(a)(1); and *Old Republic Ins. Co. v. Fed. Crop Ins. Corp.*, 947 F.2d 269 (7th Cir. 1991). The principles set forth in the Appropriations and Property Clauses generally require that agencies establish and affirmatively collect their debts, not forgive or waive debts, and charge interest on unpaid debts. *See* U.S. CONST. art. I, § 9, cl. 7 and art. IV, § 3, cl. 2. The term "property" includes the "right" to collect a debt owed to the United States. *See Royal Indemnity Co. v. United States*, 313 U.S. 289, 294-95 (1941) (citations omitted) (unless Congress gives statutory authorization to forgive debt, an agent of the government does not have the power to extinguish the right to payment that was

constitutionally reserved to Congress).  Further, the United States Supreme Court has recognized that "[a]lthough as a sovereign the United States may not be sued, yet as a corporation or body politic they may bring suits to enforce their contracts and protect their property, in the State courts, or in their own tribunals administering the same laws."  *Cotton v. United States*, 52 U.S. 229, 231 (1851)).  Indeed, the heads of executive agencies "shall try to collect a claim of the United States Government for money or property arising out of the activities of, or referred to, the agency."  31 U.S.C. § 3711(a)(1).  Recoupment of PRF funds therefore aligns with the Agency's Constitutional duties and authority of the government recognized by the United States Supreme Court over one hundred and fifty years ago.

### 2. Section 553(a)(2) Exempted the PRF Terms and Conditions from Rulemaking Requirements.

Even if the PRF Terms and Conditions were legislative in nature, the APA effectively exempted them from rulemaking requirements.

Plaintiffs do not dispute their receipt of the PRF funds, their attestation of the terms and conditions, or the ensuing formation of a contract with the Agency.  *See generally* SAC ¶¶ 1, 82, 84, 86, 88, 89, 91, 93.  This is significant because Section 553(a)(2) exempts from the rulemaking requirements any "matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts."  5 U.S.C. § 553(a)(2).  Section 553(a)(2)'s exemption includes the requirements that the agency publish general notice of proposed rulemaking in the Federal Register, § 553(b) (*i.e.*, notice), and provide interested persons an opportunity to participate in rulemaking through submission of written data or arguments, § 553(c) (*i.e.*, comment).  *See City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 613 (E.D. Pa. 2017) (involving grant conditions); *see also Housing Authority of the City of Omaha v. U.S. Housing Authority*, 468 F.2d 1 (8th Cir. 1972) (applying § 553(a)(2)'s exemption for agency contracts), *cert. denied*, 410 U.S. 927 (1973);

*Rainbow Valley Citrus Corp. v. FCIC*, 506 F.2d 467 (9th Cir. 1974) (same); *Langevin v. Chenango Court, Inc*., 447 F.2d 296 (2d Cir. 1971) (same).

Although HHS adopted a policy statement in 1971 requiring it to follow notice-and-comment procedures despite § 553(a)(2), HHS's waiver does not apply in this case given the public health emergency caused by the COVID-19 pandemic.  The 1971 waiver expressly carved out such emergency situations, stating:

> Effective immediately, all agencies and offices of the Department which issue rules and regulations relating to public property, loans, grants, benefits, or contracts are directed to utilize the public participation procedures of the APA, 5 U.S.C. 553. Although the APA permits exceptions from these procedures when an agency for good cause finds that such procedures would be impracticable, unnecessary or contrary to the public interest, such exceptions should be used sparingly, as for example in *emergenc[i]es*….

Public Participation in Rule Making, 36 Fed. Reg. 2532 (Jan. 28, 1971) (emphasis added).

That COVID-19 created an unprecedented public health emergency is beyond dispute.  On January 31, 2020, Secretary Alex M. Azar declared a public health emergency effective January 27, 2020.  SAC ¶ 28.  At the time the CARES Act was enacted, the American healthcare system was facing an existential crisis.  *See id*. ¶ 47 (averring "medical providers across the country were dealing with a never before experienced global pandemic" and "[m]edical providers were required to implement costly new processes and procedures for patients and staff, and don personal protective equipment to minimize the exposure to and spread of the coronavirus").  According to the HHS Office of Health Policy, the pandemic "'put extreme stress on the healthcare workforce in the United States, leading to workforce shortages as well as increased health care worker burnout, exhaustion, and trauma.'"  *Id*. ¶ 48.

The CARES Act was sweeping legislation intended to provide emergency assistance in response to the COVID-19 pandemic.  *Id*. ¶ 29.  Congress recognized that healthcare providers

bore a disproportionate share of the burden responding to the COVID-19 pandemic.  *Id.* ¶ 2.  As such, the paramount goal for the Agency was to get funds to healthcare providers as quickly and efficiently as possible.  *See generally id.* ¶ 39, 41.  Indeed, the CARES Act and subsequent statutes required the Agency to make payments "in consideration of the most efficient payment systems practicable to provide emergency payment."  CARES Act, 134 Stat. at 563, PPPHCEA, 134 Stat. at 622-623, CAA, 134 Stat. at 1920.

Under these circumstances, adherence to traditional notice-and-comment procedures before distribution of PRF funds was not practicable or in the best interest of the public.  Indeed, HHS did not believe certain guidance implementing the CARES Act was subject to the APA's notice-and-comment requirements given the "urgent need to help facilitate the nation's response to the public health emergency posed by COVID-19."  *See* SAC ¶ 41.  "Good cause existed for the same reasons underlying the issuance of the March 13, 2020 Proclamation on Declaring a National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Outbreak and the determination, under section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5121 et seq., that a national emergency exists nationwide as a result of the COVID-19 pandemic and the same reasons underlying the issuance of the January 31, 2020 declaration that a public health emergency exists, under section 319 of the PHS Act.."  *Id.* Ex. 2 n.3 (ECF No. 55-2 at 2).

Given the public health emergency and the Agency's critical role in supporting the American healthcare system during the pandemic, good cause existed to exempt the Agency from its 1971 waiver.  *See Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984) (noting that agencies "should have more latitude in determining when to invoke 'good cause' when notice and comment requirements are self-imposed" so the exception should not be construed "extremely narrowly")).

**B. The Paperwork Reduction Act Governed the PRF Reporting Requirement – Not the Administrative Procedure Act.**

Generally, the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501 *et seq*., sets forth a process for government agencies desiring to collect information from small businesses, individuals, state and local governments, etc. *Id*. § 3501(1). The PRA prohibits any federal agency from adopting regulations which impose paperwork requirements on the public unless the information is not available from another source within the federal government, and the agency must minimize the burden on the public to the extent practicable. *Id*. § 3507(a)(1). A purpose of the PRA also is to help agencies reduce waste and fraud. *Id*. § 3501.

"Collection of information" is defined as "obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency" that call for either "answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons, other than agencies, instrumentalities, or employees of the United States," or "answers to questions posed to agencies, instrumentalities, or employees of the United States which are to be used for general statistical purposes." *Id.* § 3502(3)(A)(i)-(ii). According to the United States Supreme Court, "[t]ypical information collection requests include … questionnaires, compliance reports, and tax or business records." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 33 (1990). The D.C. Circuit has concluded that "[t]o come within this definition the [device in question] must impose a 'reporting requirement' on applicants." *Benkelman Tel. Co. v. FCC*, 220 F.3d 601, 607 (D.C. Cir. 2000) (quoting *Saco River Cellular, Inc. v. FCC*, 133 F.3d 25, 33 (D.C. Cir. 1998)). An "information collection request" is defined as: "a written report form, application form, schedule, questionnaire, reporting or recordkeeping requirement, collection of information requirement, or other similar method calling for the collection of information." 44 U.S.C. § 3502(11).

15

While the APA generally requires agency rules to go through notice-and-comment, *see* 5 U.S.C. § 553(b), *Mendoza,* 754 F.3d at 1021, that is not the case with an information collection. If a rule is more properly classified as an "information collection" mechanism, that rule is not subject to APA notice-and-comment procedures and instead falls under the ambit of the PRA. *See Mutasa v. U.S. Citizenship & Immigr. Servs.*, 531 F. Supp. 3d 888, 900 n.6 (D. N.J. 2021); *see also Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 54 (D.D.C. 2018).

For example, in *Nat'l Fair Hous. All*., the court evaluated whether the PRA or APA applied to a United States Department of Housing and Urban Development ("HUD") rule requiring program participants to use HUD-created assessment tools when preparing assessments of fair housing reports ("AFH"). 330 F. Supp. 3d at 54-55. The court determined that the assessment tools were information requests subject to the PRA, because they were essentially questionnaires intended to assist HUD program participants to determine the presence of restrictions on fair housing choice and opportunity, "rather than 'effect[ing] a substantive change in existing law or policy.'" *Id*. at 55 (quoting *Mendoza,* 754 F.3d at 1021); *see also id*. at 55-56 (noting also that the assessment tools imposed a reporting requirement). The court further explained "[g]iven the definition of 'Assessment Tools' as 'forms or templates and the accompanying instructions provided by HUD that program participants must use to conduct and submit an AFH,' 24 C.F.R. § 5.152, HUD properly determined that the Assessment Tools were subject to the requirements of the PRA, rather than the APA." *Id*. at 56.

Like HUD's assessment tools, the reports to be submitted by PRF recipients were essentially "questionnaires," or "[t]ypical information collection requests." *See Dole*, 494 U.S. at 33. Indeed, consistent with the requirements of the CARES Act, the Agency sought to collect information from PRF recipients concerning their use of the funds to ensure compliance with the

conditions of payment and eligibility and otherwise prevent fraud and abuse. *See* Pub. L. No. 116-136, 134 Stat. 281 (2020). As such, the Agency sought a waiver of the PRA requirements to initiate reporting and later sought Office of Management and Budget ("OMB") clearance under the PRA to continue reporting. *See* 86 Fed. Reg. 40064. In fact, the Agency's Information Collection Request Notice published in the Federal Register expressly stated:

> HRSA is currently operating under the Paperwork Reduction Act Public Health Emergency (PHE) waiver that was approved by the Office of the Assistant Secretary for Planning and Evaluation on January 14, 2021. In anticipation of the PHE waiver expiring, HRSA is undergoing the OMB clearance process as the data will be collected beyond the PHE.

*Id*.

That the PRF reporting requirement also helped the Agency determine whether to initiate enforcement action does not preclude it from qualifying as an information collection mechanism under the PRA. Indeed, "Agencies impose the requirements on private parties in order to generate information to be used by the agency in pursuing some other purpose. For instance, agencies use these information requests in gathering background on a particular subject … and monitoring business records and compliance reports for signs or proof of nonfeasance to determine when to initiate enforcement measures." *Dole,* 494 U.S. at 33. Likewise, the PRA contemplates both voluntary and mandatory information collection requests. *See id*. at 35-36 ("The commonsense view of 'obtaining or soliciting facts *by an agency'* is … Congress used the word 'solicit' in addition to the word 'obtain' in order to cover information requests that rely on the voluntary cooperation of information suppliers as well as rules which make compliance mandatory."). Further, a purpose of the PRA is to reduce waste and fraud. 44 U.S.C. § 3501. As such, the PRF reporting requirement is an information collection mechanism subject to the PRA not the APA.

## II.    ASSUMING THE APPLICABILITY OF THE APA, THE CHALLENGED ACTIONS ARE NOT SUBJECT TO JUDICIAL REVIEW.

The actions for which Plaintiffs seek judicial review are not reviewable under the APA. "[B]efore any review at all may be had," "a party must first clear the hurdle of § 701(a), *Heckler v. Chaney*, 470 U.S. 821, 828 (1985), which precludes review under the APA if the challenged agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  The § 701(a)(2) standard for agency discretion applies when there is "no meaningful standard against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830.

In determining whether a challenged action is committed to agency discretion by law and thus unreviewable under the APA, the Fourth Circuit follows a two-part inquiry by analyzing: (1) whether the challenged action has traditionally been committed to agency discretion; and (2) whether Congress set forth any limits to the agency's discretion. *Holbrook v. Tennessee Valley Authority*, 48 F.4th 282, 290 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2608 (2023).

### A.  Implementation of PRF Payments is Similar to Actions Traditionally Committed to Agency Discretion.

According to the Fourth Circuit, "[n]o clean rule materializes for determining whether an agency action is the kind of action that has traditionally been committed to agency discretion." *Id.* However, the Supreme Court has considered whether the action involves: (1) a complicated balancing of a number of factors peculiarly within the agency's expertise (*e.g.*, decisions that involve resource allocation and the need for flexibility to adapt to changing circumstances); (2) the use of coercive power, triggering the traditional rights-protecting duties of the federal courts; and (3) enjoys a tradition of nonreviewability. *Id.*  With a traditional category, "the 'presumption of reviewability' under the APA flips, and the agency action becomes 'presumptively unreviewable.'" *Id.* at 289-90 (quoting *Heckler*, 470 U.S. at 831-32).

18

The Supreme Court has held that an agency's decision to allocate funds from a lump-sum appropriation is traditionally regarded as committed to an agency's discretion, because the whole purpose of such an appropriation is to grant the agency flexibility to spend funds. *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). Other examples of actions traditionally committed to agency discretion include the decision not to institute enforcement proceedings, *Heckler*, 470 U.S. at 831-832, a decision by an intelligence agency to terminate an employee in the interest of national security, *Webster v. Doe*, 486 U.S. 592, 600-601 (1988), and Tennessee Valley Authority ratemaking, *Holbrook* 48 F.4th at 290-91.

Here, amid an unprecedented global pandemic, Congress left the Agency in charge of disbursing over $178 billion to providers for health care related expenses or lost revenues attributable to the coronavirus, CARES Act, 134 Stat. at 563, PPPHCEA, 134 Stat. at 620, CAA, 134 Stat. at 1182, "in consideration of the most efficient payment systems practicable to provide emergency payment." CARES Act, 134. Stat. at 563; PPPHCEA, 134 Stat. at 622-23; CAA, 134 Stat. at 1920. Congress further charged the Secretary with implementation of the reporting requirement to ensure satisfaction of the conditions of payment and eligibility. *Id*. Providers were not entitled to PRF payments, so traditional rights-protecting duties of the federal courts are not implicated. Distribution of the PRF payments and implementation of the reporting requirement is analogous to the lump-sum appropriation in *Lincoln v. Vigil* because Congress determined the Agency needed flexibility in light of the rapidly-evolving public health crisis.

**B.  Congress Gave the Secretary Discretion to Implement PRF Reporting.**

Although Congress may overcome the presumption against review by providing "guidelines for the agency to follow in exercising its enforcement powers," by "setting substantive priorities, or by otherwise circumscribing an agency's power," *Holbrook*, 48 F.4th at 293,

Congress took no such action with respect to the PRF payments. Rather, Congress intentionally gave the Secretary discretion to determine what documentation, reporting, and enforcement is appropriate to ensure compliance with statutory conditions of payment. The CARES Act provides recipients of PRF payments "*shall* submit reports and maintain documentation *as the Secretary determines are needed* to ensure compliance with conditions that are imposed by this paragraph for such payments, and such reports and documentation shall be in such form, with such content, and in such time as the Secretary may prescribe for such purpose." CARES Act, 134 Stat. at 563 (emphasis added). However, there is no guidance in the CARES Act on how the Agency should implement the reporting requirement beyond the calculation of lost revenue – Congress left that to agency discretion.

Recently, in another case involving PRF payments, the district court in *Hospital for Special Surgery v. Becerra, et al*., No. 22-2928, 2023 WL 5448017 (D.D.C. Aug. 24, 2023), determined the Agency's distribution of PRF payments under Phase 3 was unreviewable under the APA. *Id*. at *6-*7. The court noted that the CARES Act was "*fairly barebones*" concerning how the Agency would distribute funds and the challenged actions were "implicitly committed to agency discretion based on the *incredibly broad language* of the statute," and unreviewable. *Id*. (emphasis added).

As such, applying the Fourth Circuit's two part-inquiry shows that implementation of the PRF reporting requirement and enforcing the conditions of payment were actions committed to agency discretion by law. Congress intended to give the Agency maximum discretion in implementing the reporting requirement for the Provider Relief Fund and enforcement of the conditions of payment, and Plaintiffs can offer no basis for this Court to conclude otherwise. As such, the challenged actions are nonreviewable.

III.    **PLAINTIFFS FAIL TO STATE A PLAUSIBLE PROCEDURAL DUE PROCESS CLAIM.**

As a threshold matter, to establish a cognizable procedural due process claim, Plaintiffs must allege a protected property interest. *Mathews v. Eldridge,* 424 U.S. 319, 332 (1976). They have not done so.

To possess a federally protected property interest, a person must have a "legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Such a claim does not arise from the Constitution, but rather from an independent source such as state or local law. *See id.* However, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577. Where a plaintiff's property interest vests only after satisfaction of conditions precedent, plaintiff cannot allege a protectible property interest. *See, e.g., Hasanaj v. Detroit Pub. Sch. Cmty. Dist.*, 35 F.4th 437, 448 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 2560 (2023) (teacher had no protected property interest in his job where he had not satisfied state's statutory tenure requirements).

Here, Plaintiffs do not allege, nor could they, that they had a protected property interest in PRF payments to which they were not entitled. The PRF payments were rife with conditions. For example, Plaintiffs had to "provide diagnoses, testing, or care for individuals with possible or actual cases of COVID-19," CARES Act, 134 Stat. at 563, not use PRF payments "to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse," *id.*, and Plaintiffs were required to submit reports, *id.* ¶ 45. Because Plaintiffs were required to satisfy the conditions of payment in order to retain the PRF payments, Plaintiffs cannot allege a protected property interest in the payments, and thus cannot state a plausible procedural due process claim.

IV.    **PLAINTIFFS FAIL TO STATE A PLAUSIBLE SEVENTH AMENDMENT CLAIM.**

Plaintiffs improperly allege that Defendants impose a 25 percent civil penalty "to punish and deter" when recouping a PRF payment due to the recipient's failure to timely report. *See* SAC ¶¶ 162, 176, 178, 185. To the contrary, Defendants imposed no such civil penalties on Plaintiffs notwithstanding their failure to report.

The Department of the Treasury, Bureau of the Fiscal Service, Disbursing and Debt Management (DDM) charges referring agencies fees to recover costs associated with the debt collection services DDM provides to referring agencies. 31 U.S.C. §§ 3711(g)(6) ("Any agency operating a debt collection center to which nontax claims are referred or transferred under this subsection may charge a fee sufficient to cover the full cost of implementing this subsection [collection and compromise]."), 3716(c)(4) ("The Secretary of the Treasury may charge a fee sufficient to cover the full cost of implementing this subsection [administrative offset]"), 3720A(d) ("The Secretary of the Treasury shall issue regulations prescribing the time or times at which agencies must submit notices of past-due legally enforceable debts, the manner in which such notices must be submitted, and the necessary information that must be contained in or accompany the notices. The regulations shall specify…the fee that an agency must pay to reimburse the Secretary of the Treasury…..").[3]

In general, the amount of the fee is determined yearly by overall program costs rather than based on the collection of a specific debt, as permitted by 31 U.S.C. § 3711(g)(6) and 31 C.F.R. §

---

[3] *See also* 31 C.F.R. §§ 285.2(h)(allowing for fees for offset of tax refund payments to collect past-due, legally enforceable nontax debt), 285.4(g)(allowing for fees for offset of federal benefit payments to collect past-due, legally enforceable nontax debt), 285.7(j)( allowing for fees for offset of federal salary payments), 285.12(j)(allowing or fees "sufficient to cover the full cost of providing debt collection services"), 901.9(c)(providing that agencies "shall assess administrative costs incurred for processing and handling delinquent debts").

285.12(j).  Federal agencies collecting nontax debts generally must pass on all debt collection costs, including fees charged by DDM, to the debtor.  *See, e.g.,* 31 U.S.C. § 3717(e)(1); 31 C.F.R. § 901.1.

These administrative costs arising from DDM's fees are not civil money penalties with the potential to implicate the Seventh Amendment's trial-by-jury protections.  Rather, the charging of costs is meant to cover the government's losses associated with the processing and handling of delinquent debt.  31 U.S.C. § 3717(e)(1) (agencies must assess "a charge to cover the cost of processing and handling a delinquent claim").  As such, the Supreme Court's decision in *Securities and Exchange Commission v. Jarkesy*, 144 S.Ct. 2117, (2024), has no bearing.

In *Jarkesy*, the Supreme Court found that civil money penalties imposed by the SEC implicated the Seventh Amendment's right to a jury trial for claims that were traditionally "legal in nature" and resolved by common law courts.  *Id.* at 2128-29.  However, the Supreme Court also explained that actions that sought to restore the status quo or return unjustly obtained funds [like Defendants efforts to recoup PRF payments for failure to report] were historically handled by courts in equity and do not implicate the Seventh Amendment.  *See id.*  Indeed, the collection of the underlying PRF debt here is clearly equitable (because restitutionary) and the collection of the administrative costs is ancillary to that remedy, and thus also equitable.

The SEC determined in *Jarkesy* that an investment advisor engaged in securities fraud and "levied a civil penalty of $300,000" as a remedy.  144 S. Ct. at 2127.  The Supreme Court determined the SEC's civil money penalty sought to punish the investment advisor for past conduct.  *See id.*  The Supreme Court found that the SEC's civil money penalties were punitive because they were "designed to punish and deter, not to compensate."  *Id.* at 2130.  The Supreme Court reached this conclusion after finding that: (1) the availability of civil money penalties was

based on the perceived need to punish the defendant rather than restore the victim; (2) the size of the available penalty was based on the culpability of the defendant and the need for deterrence instead of resolving the harm suffered; and (3) the SEC was not obligated to return the civil money penalties to the victim.  *Id.* at 2129-30.

Here, dissimilar from the SEC's actions in *Jarkesy*, Defendants are seeking to cover the costs of collecting debts owed by Plaintiffs from their failure to report.  Nothing about covering debt collection costs "concern[s] culpability, deterrence, and recidivism," hallmarks of the civil money penalties in *Jarkesy*.  *Id.* at 2129.  Had Plaintiffs not failed to report or if had they repaid their resulting debt in a timely fashion, Defendants would not have incurred any costs related to the "processing and handling [of Plaintiffs'] delinquent claim."  31 U.S.C. § 3717(e)(1).  As such, the collection charges reimburse Defendants for costs they would not have incurred but for Plaintiffs' actions (or inactions).

Furthermore, the Seventh Amendment would not apply to Defendants' efforts to recoup PRF payments for failure to report because the Prover Relief Fund would fall under the "public rights" exception discussed in *Jarkesy*.  As *Jarkesy* reaffirmed, the Supreme Court has long held that Congress may properly assign "public rights" cases to non-Article III tribunals to adjudicate in the first instance.  144 S. Ct. at 2132 (citing *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1855)).  Notably, the Supreme Court has not delineated all possible matters that may be considered "public rights."  *Jarkesy*, 144 S. Ct. at 2132.  But the Court has explained that "[f]amiliar illustrations" of matters properly assigned to determination by the Executive Branch include "taxation, immigration, the public lands, [and] public health," *Crowell v. Benson*, 285 U.S. 22, 51 (1932), as well as the "granting of public benefits," *Jarkesy*, 144 S. Ct. at 2133.

Through the Provider Relief Fund, the Secretary of HHS provided funds to eligible health

care providers for health care related expenses or lost revenues attributable to the coronavirus…." CARES Act, 134 Stat. at 563, PPPHCEA, 134 Stat. at 622-623, CAA 134 Stat. at 1920. The CARES Act and subsequent statutes provided recipients of PRF payments "*shall* submit reports and maintain documentation *as the Secretary determines* are needed to *ensure compliance with conditions* that are imposed by [the CARES Act] for such payments, and such reports and documentation *shall* be in such form, with such content and in such time *as the Secretary may prescribe* for such purpose." *Id*. at 563 (emphasis added); PPPHCEA, 134 Stat. at 622-23; CAA, 134 Stat. at 1920. To keep PRF payments, health care providers had to attest to certain terms and conditions, including recoupment for failure to submit required reports. Congress further provided that Treasury could cover its costs associated with collecting a nontax debt from a referring agency. *See* 31 U.S.C. §§ 3711(g)(6), 3716(c)(4), 3720A(d). This is the process contemplated by Congress for PRF payments without involvement of the judiciary.

As indicated by the taxation, public lands, public health, and public benefits categories within the public rights exception, the government has flexibility to act to protect the disposition and use of its property and funds, without the need for a jury or an Article III court proceeding in the first instance. *Thomas v. Union Carbide*, 473 U.S. 568, 570 (1985) ("Congress has the power, under Article I, to authorize an agency administering a complex regulatory scheme to allocate costs and benefits among voluntary participants in the program without providing an Article III adjudication."). Congress used that power here through the CARES Act, tasking the Secretary of HHS with getting funds to eligible health care providers as quickly and efficiently as possible, and ensuring compliance with the conditions of payment.

## V. PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM FOR VIOLATION OF THE APPOINTMENTS CLAUSE.

Plaintiffs appear to argue that HRSA's enforcement of the reporting and recoupment Terms

and Conditions violates Article II, section 2, clause 2 of the Constitution, or the Appointments Clause, because Plaintiffs contend that the Administrator of HRSA is a principal officer within the meaning of the Appointments Clause, and thus should have been nominated by the President and confirmed by the Senate.  SAC ¶ 191.  While Plaintiffs agree that the Secretary of HHS could ratify the conduct of HRSA, Plaintiffs argue such ratification would run afoul of the APA.  *Id.* ¶¶ 191-92.

The Appointments Clause empowers the President to "nominate, and by and with the Advice and Consent of the Senate, shall appoint ... Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law."  U.S. CONST., art. II, § 2, cl. 2.  The Appointments Clause also empowers Congress to "vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*  The Appointments Clause thus establishes two tiers of officers—principal and inferior—and provides different appointment processes for each. Principal officers must be appointed by the President and confirmed by the Senate, whereas the appointment of inferior officers may, by law, be vested in the President, judiciary, or department heads. *Buckley v. Valeo*, 424 U.S. 1, 132 (1976) ("Principal officers are selected by the President with the advice and consent of the Senate.  Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary.").

Here, Plaintiffs base their Appointments Clause argument on a misreading of *Braidwood Management v. Becerra,* 104 F. 4th 930, (5th Cir. 2024).  In *Braidwood*, the Fifth Circuit ruled that a law requiring commercial health insurance plans to cover certain preventative services recommended by the U.S. Preventative Services Task Force (USPSTF) is unconstitutional, in violation of the Appointments Clause of the Constitution, because USPSTF's members were

principal officers who should have been appointed and confirmed. *Id*. at 947. The Fifth Circuit found that the "unreviewable power" of the USPSTF's members to issue preventative-care recommendations that insurers must cover by law rendered the members principal officers within the meaning of the Appointments Clause. *Id*. The Fifth Circuit further determined that the Secretary's attempt at ratification did not cure the constitutional defect. *Id*. at 948.

The Fifth Circuit, however, did not reach the same conclusions with respect to HRSA. The Fifth Circuit agreed that the HHS Secretary has the authority to review HRSA's recommendations and guidelines for preventative-care services, but it reserved judgment on whether the Secretary had effectively done so. *Id*. at 956-57. The Fifth Circuit did not expressly rule one way or the other pertaining to whether HRSA's Administrator was a principal officer under the Appointments Clause. Indeed, HRSA lacks such constitutional defects because it is an agency whose Administrator's responsibilities and duties are subject to the Secretary's control.

Since 1966, "all functions of the Public Health Service, all . . . officers and employees of the Public Health Service, and all functions of all agencies of or in the Public Health Service" have resided in the Secretary, to be delegated as he or she sees fit. Reorganization Plan No. 3 of 1966, 5 U.S.C. app. 1; *see also* 42 U.S.C. § 202 ("The Public Health Service in the Department of Health and Human Services shall be administered by the Assistant Secretary for Health under the supervision and direction of the Secretary."). Because the Public Health Service is ultimately "under the supervision and direction of the Secretary," the Secretary has the final say over its actions and the actions of its officials. *See, e.g., United States v. Arthrex, Inc*., 594 U.S. 1, 19 (1970) ("The power to superintend . . . must imply the right to judge and direct,' thereby insuring that 'the responsibility for a wrong construction rests with the head of the department when it proceeds from him.").

27

HRSA became a component of the Public Health Service through departmental reorganizations.  *See, e.g.*, 47 Fed. Reg. 38409 (Aug. 31, 1982) (establishing HRSA as an agency of the Public Health Service subject to the direction and control of the Secretary).  Thus, it is "administered by the Assistant Secretary for Health under the supervision and direction of the [HHS] Secretary," with offices and bureaus that report to the Office of the Administrator, who in turn reports to the HHS Secretary.  42 U.S.C. § 202.  In light of this structure, the Fifth Circuit acknowledged:

> with respect to HRSA, Secretary Becerra can exercise control over the guidelines it publishes by virtue of the transfer of power in HHS's Reorganization Plan No. 3 of 1966.  There, Congress authorized the Secretary to perform "all functions of the Public Health Service ... and all functions of all agencies of or in the Public Health Service."  Thus, unlike his power vis-à-vis the Task Force, Secretary Becerra has fallback powers on which he can exercise supervisory authority over … HRSA

*Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 956 (5th Cir. 2024).  Other than a strained reading of *Braidwood*, the Second Amended Complaint simply fails to set forth a violation of the Appointments Clause or any facts warranting the requested universal injunction and vacatur under Section 706 of the APA.

## VI.    PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM AGAINST THE TREASURY DEFENDANTS.

The Treasury entities are not proper parties to this lawsuit.  Treasury has no statutory role in certifying Plaintiffs' debts or determining whether their debts should be offset or other modes of collection.  Treasury performs a ministerial, mandatory, non-discretionary duty when conducting offsets on behalf of other agencies, so it is the wrong party when a debtor wants to challenge the collection action.

Federal agencies are required to refer to Treasury's Cross-Servicing program eligible

delinquent nontax debts for general debt collection services. *See* 31 U.S.C. § 3711(g)(1); 31 C.F.R. § 285.12(c)(2). Upon receipt of referred debts, Treasury takes actions to collect the debts in accordance with "otherwise applicable statutory requirements and authorities," *i.e.*, in accordance with statutory authorities applicable to the agency that referred the debt. *See* 31 U.S.C. § 3711(g)(5); 31 C.F.R. § 285.12.

Federal agencies are also required to refer delinquent nontax debts to the Treasury Offset Program ("TOP"), a centralized offset program administered by Treasury. *See* 31 U.S.C. §§ 3716(c)(6); 3720A(a); 31 C.F.R. § 285.5(a)(1). The agency determines when the debt is eligible for referral and controls whether and when to utilize TOP to collect a delinquent debt. *See* 31 U.S.C. § 3716(c)(1)(A) (requiring disbursing officials to offset nontax payments by amounts equal to a debt which a creditor agency has certified to the Treasury Secretary); *see also* 31 U.S.C. § 3720A. When submitting debts to TOP, creditor agencies are required to certify to Treasury that such debts qualify for collection by offset and that the debts are valid, delinquent, and legally enforceable. *See* 31 C.F.R. § 285.5(d)(6), 285.2(d); 31 U.S.C. § 3716(c)(1)(A). In its disbursement role, Treasury must offset federal and state payments to collect any debts submitted to TOP in accordance with 31 U.S.C. §§ 3716 and 3720A and other applicable laws. *See* 31 U.S.C. § 3720A (tax refund offset); § 3716 (offset of federal nontax payments and certain state payments); 31 C.F.R. Part 285, Subpart A.

Treasury's offset of payments based on a certification is not discretionary. Treasury must offset in accordance with 31 U.S.C. § 3716(c)(1)(A) (requiring disbursing officials to offset nontax payments by amounts equal to a debt that a creditor agency has certified to the Secretary of the Treasury). *See also* 31 C.F.R. § 285.5(c)(2) (requiring disbursing officials to offset payments when legal requirements have been met); 31 U.S.C. § 3720A(c) (requiring Treasury to offset tax

refund payments to collect delinquent federal nontax debt). As such, Treasury simply acts in a ministerial role without discretion and cannot be held liable for its non-discretionary actions. 31 U.S.C. § 3716(c)(2)(A) ("[n]either the disbursing official nor the payment certifying agency shall be liable . . . for the amount of the administrative offset on the basis that the underlying obligation, represented by the payment before the administrative offset was taken, was not satisfied.") Should a plaintiff seek to challenge the debt, such a challenge should be directed to the creditor agency in the appropriate forum.

Further, federal courts have held that claims against Treasury and its sub-agencies arising out of its collection actions are substantively meritless on their face in light of Treasury's mandatory and non-discretionary role in the offset process. *See, e.g.*, *Johnson v. Treasury*, 300 F. App'x 860, 862-63 (11th Cir. 2008) (unpublished) (complaint against Treasury properly dismissed for failure to state a claim, since Treasury "had no statutory authority over the debt, nor any role in determining whether or not the debt was valid or whether Johnson's benefit payment should be offset," and "once the IDHS certified the debt to Treasury, Treasury was legally obligated to offset Johnson's disability payment in satisfaction of the debt."); *Johnson v. United States*, 469 F. App'x 79, 81 (3d Cir. 2012) (unpublished) ("The District Court correctly determined that the Treasury Department's actions with respect to an offset are not subject to judicial review and accordingly dismissed the claim."). Accordingly, this Court should not entertain any claim against Treasury with respect to its collection actions.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Complaint should be dismissed for failure to state a claim pursuant to Rule 12(b)(6).

Erek L. Barron
United States Attorney

By:    _____/s/_____/

Rebecca A. Koch
Assistant United States Attorney
Bar number: 802108
6406 Ivy Lane, Suite 800
Greenbelt, MD 20770
Telephone: (301) 344-4233
Facsimile: (410) 962-2310
rebecca.koch@usdoj.gov
*Counsel for Defendants*