IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RONALD FAGAN, M.D., P.C., ET AL,        *

        Plaintiff,                *

            v.                *        Civil No. TJS-23-2095

U.S. DEPARTMENT OF HEALTH AND    *
    HUMAN SERVICES, ET AL.,[1]
                            *

        Defendants.
                *     *     *     *     *     *

**MEMORANDUM OPINION**

Faced with an unprecedented public health emergency, the Health Resources and Services Administration was tasked with disbursing Provider Relief Fund monies to healthcare providers overwhelmed by the COVID-19 pandemic. The funds were quickly distributed, subject to Terms and Conditions, including a requirement for healthcare providers to later submit reports to demonstrate compliance with eligibility requirements. The seven Plaintiffs are healthcare providers who received these funds that were later recouped by the Government. Plaintiffs allege that they did not receive notice regarding the reporting requirements and that the recoupment violated their rights. They challenge the collection actions against them, asserting claims under the Administrative Procedure Act, the Due Process Clause, the Seventh Amendment, and the Appointments Clause.

---

[1] Robert F. Kennedy, Jr. became HHS Secretary on February 13, 2025; Thomas J. Engels became HRSA Administrator in February 2025; and Scott Bessent became Treasury Secretary on January 28, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Robert F. Kennedy, Jr. is substituted for Xavier Becerra, Thomas J. Engels is substituted for Carole Johnson, and Scott Bessent is substituted for Janet Yellen as Defendants

Pending before the Court is the Motion to Dismiss ("Motion") (ECF No. 60) filed by Defendants U.S. Department of Health and Human Services ("HHS"); HHS Secretary Robert F. Kennedy, Jr.; Health Resources and Services Administration ("HRSA")[2]; HRSA Administrator Thomas J. Engels; United States Department of Treasury ("Treasury"); Treasury Secretary Scott Bessent; Bureau of the Fiscal Service, Revenue Collections Management Centralized Receivables Service ("CRS"); CRS Assistant Commissioner Sandra Paylor Sanders; and additional agents or employees of the United States, John Doe 1-10 and Jane Does 1-10 (collectively, "Defendants").[3] Having considered the submissions of the parties (ECF Nos. 60, 63, and 68), I find that a hearing is unnecessary. *See* Loc. R. 105.6. For the following reasons, the Motion will be GRANTED in part and DENIED in part.

## I.    Introduction

Plaintiffs are Medicare- and Medicaid-enrolled healthcare providers that received funds distributed under the Provider Relief Fund ("PRF") of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136, Title VIII, 134 Stat. 281, 563. ECF No. 55 at 4-6. Defendants recouped Plaintiffs' PRF funds after Plaintiffs failed to comply with HRSA's reporting requirements. *Id.* Plaintiffs were also subject to a 25% fee when their PRF funds were recouped. *Id.* at 3. Plaintiffs allege that they had no notice of the reporting requirements until the Treasury initiated a Collection Demand against them. By this time, they were no longer able to administratively appeal the decision to recoup their funds. *Id.*

---

[2] HRSA is a sub-agency within HHS.

[3] In accordance with 28 U.S.C. § 636(c), all parties have voluntarily consented to have the undersigned conduct all further proceedings in this case, including trial and entry of final judgment, and conduct all post-judgment proceedings, with direct review by the Fourth Circuit Court of Appeals, if an appeal is filed. ECF Nos. 14 & 17.

Plaintiffs brought this action under the Due Process Clause of the Fifth Amendment, U.S. Const. amend. V; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(2)(A), 706(2)(C) & 706(2)(D); the Seventh Amendment, U.S. Const. amend. VII; and the Appointments Clause, U.S. Const. art. II, § 2, cl. 2. ECF No. 55.

## II.    Background[4]

The CARES Act, Pub. L. 116-136, Title VIII, 134 Stat. 281, was passed on March 27, 2020, to address the economic consequences of the COVID-19 pandemic. As part of the CARES Act, Congress appropriated $100 billion toward what later became known as PRF:

> To prevent, prepare for, and respond to coronavirus . . . for necessary expenses to reimburse, through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus . . . *Provided*[], That recipients of payments under this paragraph shall submit reports and maintain documentation as the Secretary determines are needed to ensure compliance with conditions that are imposed by this paragraph for such payments, and such reports and documentation shall be in such form, with such content, and in such time as the Secretary may prescribe for such purpose.

*Id.* Congress imposed several additional eligibility requirements on providers to receive these funds. *Id.* It later appropriated an additional $78 billion for the PRF through the Paycheck Protection Program and Healthcare Enhancement Act and the Consolidated Appropriations Act of 2021. Pub. L. No. 116-139, 134 Stat. 620 (2020); Pub. L. No. 116-260, 134 Stat. 1182 (2020).

HRSA made initial distributions on April 10, 2020, to recipients who were initially eligible based on Medicare claims data. ECF No. 60-1 at 3. HRSA also issued Terms and Conditions of those funds, which stated,

> The recipient shall submit reports as the Secretary determines are needed to ensure compliance with conditions that are imposed on this Payment, and such reports

---

[4] Unless otherwise noted, the following facts are not in dispute.

shall be in such form, with such content, as specified by the Secretary in future program instructions directed to all Recipients.

ECF No. 55 ¶ 50[5]. Additional distributions were made in 2020 and 2021. ECF No. 60-1 at 3. The Terms and Conditions issued on April 20, 2020, stated,

Your commitment to full compliance with all Terms and Conditions is material to the Secretary's decision to disburse these funds to you. Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payment made from the Relief Fund. These Terms and Conditions apply directly to the recipient of payment from the Relief Fund.

ECF No. 60-1 at 8 ("Recoupment Term"). As announced in a press release, HRSA required recipients to attest to the Terms and Conditions within 45 days of receiving the funds. ECF No. 55 ¶ 52.[6] Plaintiffs received PRF funds and attested to the Terms and Conditions. ECF No. 63 at 18.

On July 26, 2021, HRSA published a notice in the Federal Register regarding the collection of information from healthcare providers:

Providers who have accepted the Terms and Conditions regarding their PRF payment(s), including the requirement that the provider 'shall submit reports as the Secretary determines are needed to ensure compliance with conditions that are imposed on this Payment . . . will be using the PRF Reporting Portal to submit information about their use of PRF payments.

86 Fed. Reg. 40064. HRSA also requested comments related to those reporting requirements. *Id.*

HRSA primarily used the HHS Provider Relief Website ("website") to announce the requirements it imposed on PRF recipients. The reporting deadlines were changed multiple times, ultimately giving the earliest recipients until November 30, 2021, to submit their reports via an

---

[5] There was variation in the Terms and Conditions of subsequent distributions, but the parties—both of whom cite the provision of the April 10, 2020 Terms and Conditions quoted above—do not specify any relevant change in the Terms and Conditions regarding reporting requirements.

[6] As announced in a press release, HRSA originally required attestation within 30 days of receipt. It later updated its policy to state that failure to return payment within 30 days would be considered acceptance of the funds. On May 7, 2020, HRSA announced it would require attesting to the Terms and Conditions within 45 days of receipt. ECF No. 55 ¶ 52.

online portal. ECF No. 55 ¶ 59. The website stated, "HRSA will officially notify all non-compliant providers alerting them of their non-compliant status with instructions on how to remediate their status (if applicable)" *Id.* ¶ 61. Notifications of non-compliance were sent via email after the reporting deadline passed. *Id.* ¶ 66.

According to guidance from HRSA, providers would receive a Final Repayment Notice via the U.S. Postal Service, which would include a unique number that the provider could use to contest the recoupment of funds through a Decision Review Portal. *Id.* ¶¶ 63-66. Plaintiffs allege that they did not receive any notice from HRSA in the mail (and that HRSA did not send them any notice by mail). *Id.* ¶ 66. According to Plaintiffs, "[t]he first notice each of the plaintiff [*sic*] received from defendants was a Collection Demand – Invoice from the [Treasury] demanding immediate repayment of the PRF grant including a 25% civil penalty." *Id.* ¶ 5.

Plaintiffs filed suit against Defendants on August 3, 2023. ECF No. 1. Plaintiffs allege that Defendants' decision to recoup Plaintiffs' PRF grants (1) violated their due process rights because they had a property interest in the funds after disbursal; (2) was arbitrary, capricious, and contrary to the CARES Act because Plaintiffs demonstrated that they were eligible for the grants; (3) was contrary to the APA because the reporting requirements and Recoupment Term did not undergo notice-and-comment; (4) violated the Seventh Amendment because Plaintiffs were entitled to a trial by jury regarding the 25% fee imposed when the funds were recouped; and (5) violated the Appointments Clause because the Administrator of the HRSA is an unconstitutionally appointed principal officer. ECF No. 55.

On November 22, 2024, Defendants filed their Motion. They allege that Plaintiffs (1) fail to state a claim under the APA because the Recoupment Term was not subject to the APA's notice-and-comment provisions or, in the alternative, is not subject to judicial review; (2) fail to state a

plausible procedural due process claim because Plaintiffs did not have a federally protected property interest in the PRF funds; (3) fail to state a plausible Seventh Amendment claim because the fee imposed on Plaintiffs was for the purpose of covering the government's losses associated with collecting the recoupment from Plaintiffs, not to punish or deter noncompliance; (4) fail to state a plausible claim for violation of the Appointments Clause because the Administrator of the HRSA was subject to the supervisory authority of the HHS Secretary; and (5) fail to state a plausible claim against the Treasury defendants because the Treasury's role was "ministerial, mandatory, [and] non-discretionary." ECF No. 60-1.

## III.  Discussion

### A.  Legal Standard

Rule 12(b)(6) permits a court to dismiss a complaint if it fails to "state a claim upon which relief can be granted." "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint, [and not to] resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (internal quotation marks omitted). A complaint must consist of "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). When considering a motion to dismiss, a court must accept as true the well-pled allegations of the complaint and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). While a court must take the facts in the light most favorable to the plaintiff, it "need not accept the legal conclusions drawn from the facts" and "need not accept as true unwarranted

inferences, unreasonable conclusions, or arguments." *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint generally "does not need detailed factual allegations." *Id.* So long as the factual allegations are "enough to raise a right to relief above the speculative level," the complaint will be deemed sufficient. *Id.* A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and that a recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

### B.    Plaintiffs' APA Claims

Plaintiffs assert three claims arising under the APA. In Count III, Plaintiffs contend the recoupment of their PRF funds was arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), because Plaintiffs were able to demonstrate that they met the statutory eligibility requirements for PRF Funds. ECF No. 55 at 28-55. In Count IV,[7] Plaintiffs assert the Recoupment Term exceeded HRSA's statutory authority, in violation of 5 U.S.C. § 706(2)(C). In Count V, Plaintiffs assert the Defendants failed to follow the notice-and-comment procedures described in 5 U.S.C. §§ 553(b)-(d), in violation of 5 U.S.C. §§ 706(A) & (D).

Defendants argue that Plaintiffs fail to state a plausible claim for relief under the APA for four reasons: First, they say that HRSA was exempt from the APA's notice-and-comment requirements because the Recoupment Term was an interpretive rule rather than a legislative rule.

---

[7] Plaintiffs identified two claims as "Count IV," however the second "Count IV" appears to be entirely duplicative of the claims made out in Count III and Count V. ECF No. 55 at 33-34. The Court will assume that the second claim labeled "Count IV" was an error.

Second, they argue that HRSA was not required to comply with the APA's notice-and-comment requirements because the Recoupment Term was exempt under 5 U.S.C. § 553(a)(2). Third, they argue that the Paperwork Reduction Act ("PRA"), rather than the APA, governs because the Recoupment Term and reporting requirements concerned information collection. Fourth, they contend that the HRSA is not subject to judicial review for the Recoupment Term and related actions because procedures for ensuring compliance with PRF eligibility requirements were committed to agency discretion by law.

For the reasons described below, I find that the Recoupment Term is subject to the APA. I also find that the PRA governed the questionnaires promulgated by HRSA to collect information, but it did not govern the Recoupment Term itself, which created a new mechanism for enforcement. However, the Recoupment Term was exempt from notice-and-comment requirements under 5 U.S.C. § 553(a)(2). Furthermore, I find that HRSA's decisions related to disbursal and retention of PRF funds are not subject to judicial review under the APA. Therefore, Plaintiffs have failed to state a claim under the APA. Count III, Count IV, and Count V will be dismissed.

### 1.    Interpretive Rules Exemption

Defendants argue that HRSA was not subject to the APA's notice-and-comment requirements because the PRF Terms and Conditions were interpretive rules that were not legislative in nature. ECF No. 32-1 at 10.

Federal agencies must comply with the APA's rulemaking procedures when "formulating, amending, or repealing a rule," unless some other statute abrogates the APA's rulemaking requirements. 5 U.S.C. § 551(g). A "rule" is defined in the APA as a "statement of general or particular applicability and future effect." 5 U.S.C. § 551(4). However, "interpretive rules," which

"state what the administrative agency thinks a statute means, and only remind affected parties of existing duties," are not subject to the notice-and-comment requirements set forth in the APA. *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341-42 (4th Cir. 1995). The critical distinction between legislative rules and interpretive rules is that the former impose new rights or duties, whereas the latter merely clarify existing ones. "A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Children's Hospital of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018).

To determine whether a rule or policy is legislative or interpretive, courts begin with the words of the authorizing statute. "Where Congress has specifically declined to create a standard, the [Agency] cannot claim its implementing rule is an interpretation of the statute." *Mendoza v. Perez*, 754 F.3d 1002, 1022 (D.C. Cir. 2014). Thus, a rule that is promulgated to fill a gap explicitly left by Congress is necessarily a legislative rather than interpretive rule. *Pelissero v. Thompson*, 170 F.3d 442, 446 (4th Cir. 1999). Courts also consider the explanation proffered by the agency to justify its policy. Where the agency relies on interpretation of the governing statute or regulation through analysis of its language and legislative history, this supports a finding that the rule is interpretive. *See, e.g., N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62 (1st Cir. 2018); *Metro Sch. Dist. of Wayne Twp v. Davila*, 969 F.2d 485, 490 (7th Cir. 1992). Where an agency's justification is not "the result of a strictly interpretive exercise," courts are more inclined to find the policy a legislative rule. *N.H. Hosp. Ass'n*, 887 F.2d at 71-72.

Defendants argue that Congress intended only for *eligible* healthcare providers to retain PRF payments, and it required reporting to verify compliance. They argue that the PRF Term requiring reporting as set forth by HRSA as a condition to retain the funds did not "alter the rights

or interests of parties" or "impose any new legal obligation" on participating healthcare providers. ECF No. 32-1 at 11-12 (quoting *James v. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000) & *United Source One, Inc. v. USDA, Food Safety & Inspection Serv.*, 865 F.3d 710, 717 (D.C. Cir. 2017)).

Plaintiffs counter that no provision of the CARES Act or its implementing regulations "can be interpreted to mean that a provider forfeits PRF payments for failing to timely file a report that it never received notice that it was required to file." ECF No. 63 at 9. Plaintiffs also note that courts have cautioned against permitting agencies to overuse the "interpretive rule" exception to APA rulemaking requirements because agencies could promulgate overly broad regulations to give themselves unfettered authority to avoid notice-and-comment by "invoking [their] power to interpret that statute and regulation in binding the public to a strict and specific set of obligations." *Id.* (quoting *N.H. Hosp. Ass'n v. Azar*, 887 F. 3d 62, 71 (rejecting HHS's attempt to use FAQs as Interpretive Rules) (internal citations omitted).

The CARES Act explicitly left a gap for the agency to fill regarding reporting requirements and mechanisms for enforcing compliance with the PRF eligibility requirements. It states,

> [R]ecipients of payments under this paragraph shall submit reports and maintain documentation as the Secretary determines are needed to ensure compliance with conditions that are imposed by this paragraph for such payments, and such reports and documentation shall be in such form, with such content, and in such time as the Secretary may prescribe for such purpose.

CARES Act, Pub. L. 116-136, Title VIII, 134 Stat. 281, 283. Congress mandated that "'funds were to go to eligible healthcare providers' for 'health care related expenses or lost revenues that are attributable to coronavirus.'" ECF No. 68 at 5 (quoting CARES Act, 134 Stat. at 563). Defendants argue that "it is a reasonable interpretation of the CARES Act that the provider could not retain the payment" if the statutorily mandated conditions were not satisfied. However, recoupment as a mechanism for ensuring compliance was not set forth in the statute. There is no process or

procedure provided to ensure compliance aside from "submit[ting] reports and maintain[ing] documentation as the Secretary determines are needed." Congress did not specifically address in the statute any directives regarding mechanisms to enforce compliance. This gap should be interpreted as a delegation of authority to fill the gap;[8] however, it cannot be construed as authorizing recoupment on its own.

HRSA's Recoupment Term, FAQs, and other guidance materials identified means and deadlines for reporting and imposed penalties (i.e., recoupment) for failure to report that were not present in any statute or regulation. Absent the Recoupment Term and other guidance from HRSA, there was no obligation on healthcare providers in the CARES ACT itself to submit the requested documents to HRSA for receiving PRF. Therefore, these HRSA policies certainly altered the obligations of PRF recipients. Thus, they are legislative rules rather than interpretive rules.

### 2.    Applicability of the Paperwork Reduction Act

Defendants argue that the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501 *et seq.*, rather than the APA, governed the PRF reporting requirements because the reporting requirement is an "information collection request." ECF No. 60-1 at 15.

The PRA applies when a federal agency collects information from the public. Under the PRA, the agency seeking to collect information must prepare an Information Collection Request ("ICR") and submit it to the Office of Management and Budget for approval before collecting the

---

[8] Having found that Congress (1) delegated authority to HRSA to make rules implementing the PRF provisions of the CARES Act, including imposing reporting requirements, and (2) clearly left a gap regarding specific reporting requirements and PRF eligibility enforcement mechanisms, Plaintiffs' argument that a clawback scheme is beyond HRSA's statutory authority is without merit. Plaintiffs' argument that the Recoupment Term or reporting requirements are *ultra vires* retroactive rules is likewise without merit since the rules did not apply retroactively; healthcare providers were only required to submit records *after* the Recoupment Term and reporting instructions were issued.

information. An ICR is defined in the PRA as "a written report form, application form, schedule, questionnaire, reporting or recordkeeping requirement, or other similar method calling for the collection of information." 44 U.S.C. § 3502(11). The Supreme Court has held that the PRA includes "information requests that rely on the voluntary cooperation of information suppliers as well as rules which make compliance mandatory." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 33-36 (1990). Rules that fall within the PRA are not subject to the APA's notice-and-comment requirements. *Mutasa v. U.S Citizenship & Immigr. Servs.*, 531 F. Supp. 3d 888, 900 n.6 (D.N.J. 2021); *Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 54 (D.D.C. 2018).

Section 319(f) of the Public Health Services Act, 42 U.S.C. § 247d(f), provides that, during a public health emergency ("PHE"),

> [if] the circumstances of such public emergency . . . necessitate a waiver from [the PRA] . . . then the requirements of [the PRA] with respect to voluntary collection of information shall not be applicable during the immediate investigation of, and response to, such public health emergency during the period of such public health emergency.

42 U.S.C. § 247d(f)(1).

HRSA published an ICR in the Federal Register in July 2021, which stated it was "currently operating under the [PRA PHE] waiver that was approved by the Office of the Assistant Secretary for Planning and Evaluation on January 14, 2021" and was "undergoing the OMB clearance process as the data will be collected beyond the PHE." 86 Fed. Reg. 40064.

Plaintiffs argue that the PRA does not apply because the HRSA administrator not only "prescribed forms and questions for the collection of information" but also "expand[ed] his mandate to permit himself the power to clawback funds." ECF No. 63 at 12. Plaintiffs contend, because HRSA created a legislative rule that allowed it to recoup the funds, that the agency's action falls within the purview of the APA rather than the PRA.

Defendants counter that agencies are permitted to use information collected under the PRA for other purposes, "[f]or instance . . . monitoring business records and compliance reports for signs or proof of nonfeasance to determine when to initiate enforcement measures." ECF No. 68 at 9 (citing *Dole*, 494 U.S. at 33-36). Therefore, they contend that the PRA governs, notwithstanding the fact that HRSA used the reported information to determine eligibility and recoup funds from noncompliant healthcare providers

The purpose of the PRA is to "minimize the paperwork burden for [regulated entities] resulting from the *collection of information* by or for the Federal Government." 44 U.S.C. 3501(1) (emphasis added). The federal government can use the information collected under the PRA to enforce compliance with existing laws. However, to read the PRA as authorizing an agency to promulgate new regulations that impose legal obligations on regulated entities without being subject to the APA would greatly go beyond the statute's scope. Under Defendants' theory, any agency would essentially be authorized to use the PRA for all rulemaking, with the only limits being that the rule (1) imposes a reporting requirement and (2) the agency's enforcement is based upon the reported information or compliance with reporting requirements. This construction would be an unacceptable interpretation of the PRA, and unsupported by any legal authority.

In this case, the PRA exempts HRSA from the APA's rulemaking requirements regarding the information request itself—that is, the questionnaires distributed to healthcare providers to report information demonstrating their eligibility for PRF funds—and using that information to enforce other properly promulgated laws. However, HRSA may not rely on the PRA alone to create a new enforcement mechanism, such as the ability to make the clawbacks at issue in this case.

Plaintiffs also argue that "the Secretary of HHS did not comply with the requirements of the PRA, but instead chose to exempt himself from that regulation, too." ECF No. 63 at 12. As Defendants point out, Plaintiffs do not elaborate on this assertion or provide any authorities to support it. The mere fact that Defendants relied on the emergency exemption of the PRA does not mean that the Secretary did not comply with its requirements; exemptions such as these exist to permit an agency to respond to emergencies quickly *without* violating the statute. Plaintiffs present no argument that the COVID-19 pandemic was not a public health emergency within the meaning of the PRA. And they fail to set forth how Defendants "did not comply with the requirements of the PRA." This argument lacks merit.

In sum, HRSA's reporting requirements were exempt from the APA's notice-and-comment requirements under the PRA, but the Recoupment Term is not exempt under the PRA.

### 3.     5 U.S.C. § 553(a)(2) Exemption

Defendants argue that HRSA was exempt from the APA's notice-and-comment requirements under 5 U.S.C. § 553(a)(2). ECF No. 60-1 at 15.

The APA carves out an exception to its notice-and-comment requirements "to the extent that there is involved . . . a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2). However, the HHS adopted a policy statement in 1971 that waived this exception. The waiver states:

> Effective immediately, all agencies and offices of the Department which issue rules and regulations relating to public property, loans, grants, benefits, or contracts are directed to utilize the public participation procedures of the APA, 5 U.S.C. 553. Although the APA permits exceptions from these procedures when an agency for good cause finds that such procedures would be impracticable, unnecessary or contrary to the public interest, such exceptions should be used sparingly, as for example in emergences [*sic*] and instances where public participation would be useless or wasteful because proposed amendments to regulations would cover minor technical matters.

Public Participation in Rule Making, 36 Fed. Reg. 2532 (Jan. 28, 1971) ("1971 HHS Policy").

Defendants argue that the § 553(a)(2) exemption applies because the policy in question relates to grants and contracts.[9] ECF No. 60-1 at 15. They also argue that the 1971 HHS Policy does not preclude them from relying on the § 553(a)(2) exemption because the COVID-19 pandemic and the urgent need to disburse funds was an "emergency" within the meaning of the 1971 HHS Policy. *Id.* at 15-16. Because the Policy identified "emergencies" as a type of circumstance in which it is appropriate to forgo the APA's rulemaking requirements, Defendants assert that they were not barred from exercising the § 553(a)(2) exemption. They also argue that, because the 1971 HHS Policy essentially created a self-imposed notice-and-comment requirement, HRSA "should have more latitude in determining whether to invoke 'good cause'" than if the notice-and-comment requirement was Congressionally mandated. *Id.* (quoting *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984) (holding that good-cause exceptions to self-imposed notice-and-comment requirements should not be construed overly narrowly).

Plaintiffs argue that Congress explicitly waived the APA's notice and comment requirements for the Small Business Administration in Section 1114 of the CARES Act, but no such waiver was included in the PRF provisions for HRSA. ECF No. 63 at 10-11. They argue that this omission indicates Congressional intent for HRSA to follow ordinary APA rulemaking procedures when imposing reporting requirements on recipients of PRF funds. *Id.* Plaintiffs argue that Congress was "well aware of the emergency created by the COVID-19 pandemic" when enacting the CARES Act, and that the Defendants "ignore[d] the will of Congress" by imposing reporting requirements without first undergoing the notice-and-comment process. *Id.*

---

[9] Defendants contend a contract was formed between Plaintiffs and HRSA when each Plaintiff attested to the Terms and Conditions of receiving PRF Funds. ECF No. 60-1 at 16. Plaintiffs' do not challenge this assertion.

There are two questions to resolve: (1) whether the § 553(a)(2) exemption applies to the reporting requirements and related recoupment, and (2) if the exemption does apply, whether the 1971 HHS Policy nonetheless requires compliance with the notice-and-comment provisions of the APA.

The § 553(a)(2) exemption from the notice and comment provision applies to HRSA's reporting requirements and recoupment terms for the failure of a healthcare provider to comply. The PRF's reporting requirements clearly relate directly to grants or contracts. Reporting is a condition for beneficiaries to obtain and retain grant funds, and when Plaintiffs attested to the Terms and Conditions of receiving the funds, a contract was formed between HRSA and each of the Plaintiffs. "[A]s written, the APA does create a serious gap in the procedural protections the APA was enacted to provide." *Nat'l Wildlife Fed'n v. Snow*, 561 F.2d 227, 231 (D.D.C. 1976). However, there is "no principled way to remedy that gap by a narrowing construction." *Id.* The Eighth Circuit has found that the legislative history of the Act supports a reading that "exempted regulations [are] limited to those where the excepted subjects were directly involved [and] where the government had a 'proprietary' or other unique interest." *Hous. Auth. of City of Omaha, Neb. v. U.S. Hous. Auth.*, 468 F.2d 1, 9 (8th Cir. 1972). It is clear from the plain language of the statute that the exception has broad applicability to grant conditions and matters directly related to contracts involving an agency. *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 613 (E.D. Pa. 2017) ("[G]rant conditions . . . are not subject to the rulemaking requirements of 5 U.S.C. § 553, including [notice and comment]."); *Rainbow Val. Citrus Corp. v. Federal Crop Ins. Corp*, 506 F.2d 467, 469 (9th Cir. 1974) (holding that an agency decision related to crop insurance contracts "falls squarely within the public contracts exception"); *Langevin v. Chenango Ct., Inc.,*

447 F. 2d 296, 300 (2d Cir. 1971) (holding that the exception covers FHA decisions regarding rents).

Plaintiffs overstate the impact of Congress's waiver of the notice-and-comment requirements for the Small Business Administration. Inclusion of specific waiver language in an unrelated provision of the CARES Act does not somehow act to supersede the § 553(a)(2) exemption to rulemaking procedure as it applies to the PRF process. Statutory interpretation begins with the plain text of the statute. *Groff v. DeJoy*, 600 U.S. 447, 468, (2023). Courts look beyond the statutory text only when the plain meaning is ambiguous. *See, e.g.*, *Pharm. Coal. For Patient Access v. United States*, 126 F.4th 947 (4th Cir. 2025). There is no ambiguity in the text of 5 U.S.C. § 553(a)(2), which waives the rulemaking requirements for "matters relating to . . . grants [and] contracts." 5 U.S.C. § 553(a)(2). Omission of a specific waiver from any notice-and-comment requirements in the PRF provisions of the CARES Act cannot be construed as altering the plain text of the APA.

Furthermore, HRSA is not prohibited from exercising the § 553(a)(2) exemption by the 1971 HHS Policy. The 1971 HHS Policy contemplates "sparing[]" use of the exemption in "emergency" situations. The COVID-19 pandemic was such an emergency, *see* Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19), Trump White House (Mar. 13, 2020), https://perma.cc/WF55-8M4P, and the use of the exemption, notwithstanding the 1971 HHS Policy, was appropriate to permit the speedy distribution of PRF funds to healthcare providers. Because HRSA was exempt from notice-and-comment under 5 U.S.C. § 553(a)(2) and the COVID-19 pandemic was an "emergency" within the meaning of the 1971 HHS Policy, HRSA was not required to undergo notice-and-comment before imposing the Terms and Conditions and seeking recoupment of funds from noncompliant healthcare providers.

17

### 4.    Judicial Review of HRSA's Decision-Making

Defendants argue that HRSA's decisions regarding distribution of the PRF funds, including reporting requirements and recoupment for non-compliance, are not subject to judicial review under the APA.

The APA waives the federal government's sovereign immunity, creates a cause of action for parties who are adversely affected by agency action, and defines the scope of judicial review of agency action. 5 U.S.C. §§ 701-706. Section 701(a) states, "[t]his chapter applies, according to the provisions thereof, except to the extent that . . . agency action is committed to agency discretion by law." Section 706 authorizes courts to "hold unlawful and set aside agency action, findings, and conclusions found to be":

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).

However, "before any review at all may be had, a party must first clear the hurdle of § 701(a)." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985). The Fourth Circuit applies a two-part inquiry to determine whether an agency action is "committed to agency discretion by law" under § 701(a) and thus not subject to judicial review.. *Holbrook v. Tennessee Valley Auth.*, 48 F.4th 282, 290 (4th Cir. 2022). First, a court looks to whether the action "is the kind of agency action that 'has traditionally been committed to agency discretion.'" *Id.* (quoting *Chaney*, 470 U.S. at 832). "Once we are in a traditional category, the 'presumption of reviewability' under the APA

flips, and the agency action becomes 'presumptively unreviewable.'" *Id.* at 289. Second, a court asks whether the authorizing statute "intentionally limits agency discretion by setting guidelines or otherwise providing a limit." *Id.* at 290. If the answer is "no,", then the agency action is "committed to agency discretion" and is not reviewable under the APA. *Id.*

> The United States Supreme Court has held:
>
> The allocation of funds from a lump-sum appropriation is . . . [an] administrative decision traditionally regarded as committed to agency discretion. After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.

*Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (holding that the Indian Health Service's decision to end a program that provided services to handicapped Indian children from lump-sum appropriations by Congress was not subject to judicial review). Defendants argue that HRSA's decision to impose reporting requirements on PRF recipients and then seek to recoup funds from healthcare providers who do not comply with reporting requirements "is analogous to the lump-sum appropriation in *Lincoln v. Vigil*." ECF No. 60-1 at 22. The CARES Act tasked HRSA with "disburs[ing] over $178 billion to healthcare providers for health care related expenses or lost revenues attributable to the coronavirus" and "implementation of the reporting requirement to ensure satisfaction of the conditions of payment and eligibility." *Id.* (citing CARES Act, 134 Stat. at 563; PPPCHEA, 134 Stat. at 620; CAA, 134 Stat. at 1182). The Defendants argue that, by doing so, Congress "determined the Agency needed flexibility in light of the rapidly-evolving public health crisis." *Id.*

Plaintiffs concede "the agency's decision of how to allocate funds from a lump-sum appropriation . . . is traditionally regarded as committed to an agency's discretion, because the whole purpose of such an appropriation is to grant the agency flexibility to spend funds." ECF No. 63 at 12. However, Plaintiffs assert that they are "not challenging the agency's decision of how to

allocate funds," but "rather that the Agency's actions are arbitrary and capricious, exceed its statutory authority and were contrary to law." *Id.* Plaintiffs further assert they met the statutory criteria to receive the PRF money and "followed all applicable instructions for which they received notice." They allege that HRSA's action was therefore arbitrary and capricious, "in excess of statutory jurisdiction, authority, . . . or short of statutory right. *Id.* at 14-15 (citing 5 U.S.C. § 706(2).

It is clear that the CARES Act and subsequent statutes allocated lump sums of money to HRSA for disbursement to healthcare providers. Yet, Plaintiffs challenge HRSA's clawback of the PRF funds paid to them due to non-compliance with HSRA's reporting requirements. The Plaintiffs' arguments lack merit. At bottom, Plaintiffs are challenging HRSA decision regarding the allocation  of lump-sum funds. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002) (holding that a "decision about how the moneys . . . could best be distributed consistent with the statute" is a decision that is traditionally left to agency discretion); *Hospital for Special Surgery v. Becerra, et al.*, No. 22-2928, 2023 WL 5448017 (D.D.C. Aug. 24, 2023). HRSA's decisions regarding how to allocate PRF funds, including its decisions regarding recoupment for non-compliance with its reporting requirements, are the type of agency action traditionally left to the agency's discretion, and is presumptively non-reviewable under the APA.[10]

As to the second step, asking whether the authorizing statute "intentionally limits agency discretion," *Holbrook*, 48 F.4th at 290, It does not. Plaintiffs concede that the CARES Act "unambiguously sets forth the authority of the Secretary of HHS to determine what reports and documentation are needed to ensure compliance with conditions that are imposed by the CARES Act for such payments and to prescribe the form and content of such reports and the time such

---

[10] Plaintiffs do not make any effort to attempt to distinguish their situation from lump-sum appropriations in *Lincoln v. Virgil* or otherwise set forth any argument that HRSA's actions are not the type which is traditionally left to agency discretion.

reports shall be submitted." ECF No. 55 ¶ 138. The CARES Act was "fairly barebones" in its provisions regarding distribution of PRF funds and distribution was therefore "implicitly committed to agency discretion based on the incredibly broad language of the statute." *Hosp. for Special Surgery v. Becerra*, 2023 WL 5448017 at *6-7.

HRSA, in its discretion, determined to use the mechanism of recoupment of funds to enforce compliance by healthcare providers with conditions imposed by the CARES Act for receiving PRF. This decision is not reviewable under the APA.

### D.    Plaintiffs' Procedural Due Process Claim

Defendants next argue that Plaintiffs fail to state a plausible due process claim. ECF No. 60-1 at 24.

Due process requires the "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). To determine whether administrative procedures afford adequate due process protection, courts must consider (1) "the private interest that will be affected by the official action;" (2)  "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id*. at 335.

Before considering the *Mathews* factors, a court must determine if the interest at stake is "within the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570-71 (1972) ("[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake.").

To have a cognizable property interest in a benefit, a party must "have a legitimate claim of entitlement to it." *Id.* at 576. The source of this "legitimate claim of entitlement" may be grounded in the statute defining eligibility for the benefit, even if eligibility is in question. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254 (1970).

Defendants point to a Sixth Circuit case for the proposition that a party does not have a legitimate property interest in a benefit that is subject to unsatisfied conditions precedent. *Hasanaj v. Detroit Pub Sch. Cmyt. Dist.* 35 F. 4th 437, 448 (6th Cir. 2022). Defendants argue that the PRF payments were subject to several conditions, not all of which were satisfied, and Plaintiffs did not have a protected property interest in them. ECF No. 60-1 at 24. The conditions for the payments were that the healthcare provider: "provide diagnoses, testing, or care for individuals with possible or actual cases of COVID-19"; not use payments "to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse"; and submit reports. *Id.* (citing CARES Act, 134 Stat. at 563).

Plaintiffs counter that their situation is substantially similar to the facts of *Mathews* because their benefits were recouped "without a hearing or opportunity to be heard at a meaningful time in a meaningful manner." ECF No. 63 at 18. They assert that *Mathews* stands for the proposition that once benefits are obtained, "there is a continuing right created to keep those benefits, which right requires a level of due process to take away." *Id*. They also contend they met all the statutory eligibility requirements under the CARES Act. They assert that, once they met the statutory prerequisites for payments and received those payments, they acquired a property right in the funds they received. *Id.* at 17-18.[11]

---

[11] It is entire unclear to the Court how much money the seven plaintiffs are complaining was recouped as the Complaint is silent on this important fact.

Plaintiffs also state that they have a property interest in the PRF funds by virtue of the contract formed between Plaintiffs and Defendants. *Id*. However, in their Complaint, Plaintiffs base their due process claim on the theory that HRSA deprived them of grant funds to which they were allegedly eligible by statute, not contract. ECF No. 55 at 25-27. The Plaintiffs are foreclosed from raising this claim in their response to the Motion. *Whitten v. Apria Healthcare Grp. Inc.*, No. PWG-14-3193, 2015 WL 2227928, at *7 (D. Md. May 11, 2015) ("[A]n opposition is not a proper vehicle for amending a complaint.").

This case is distinguishable from *Hasanaj* for two reasons. First, Hasanaj challenged a school district's decision not to renew his contract upon the expiration of his previous contract. 35 F.4th at 450. The plaintiffs contest the deprivation of a benefit that they had already received, rather than one that they merely expected. Second, Hasanaj's eligibility was not an issue; Hasanaj conceded that he did not meet the statutory requirements for renewing his contract. *Id.* Here, by contrast, Plaintiffs assert that they met all statutory eligibility requirements to receive the PRF funds. There cannot be any evidence they were ineligible for the funds because the reporting requirements were not imposed until after the funds were received by Plaintiffs. I find that Plaintiffs acquired a legitimate property interest in the PRF funds upon their disbursement by HRSA and receipt by Plaintiffs.

An analysis using the *Mathews* factors is necessary. During the global COVID-19 pandemic, healthcare providers faced significant financial strain in treating patients affected by COVID-19 while continuing to perform their essential work unrelated to the pandemic. Congress recognized this crisis and allocated relief funds to healthcare providers in the CARES Act. By the time the funds were recouped, healthcare providers likely already used or allocated the funds to respond to the pandemic. Plaintiffs, therefore, had a significant interest that was affected by

HRSA's action to recoup the PRF Funds. HRSA, meanwhile, was responding to the COVID-19 pandemic by quickly disbursing funds while ensuring that they were allocated and retained only by eligible healthcare providers. The burden on the government of additional procedural safeguards, therefore, should not be understated. It is unclear at this stage what, if any, additional procedural safeguards could have been employed by HRSA, so it is not possible to determine the benefits such safeguards would have provided to Plaintiffs or the burdens they would have imposed on Defendants.

Given the Court's obligation to credit the Plaintiffs' factual claims as true, HRSA deprived Plaintiffs of the PRF funds after they were disbursed, allegedly without notice and without an opportunity to be heard. Plaintiffs have pled a plausible claim for violation of their Procedural Due Process rights beyond a speculative level. The Motion is denied as to Plaintiffs' Procedural Due Process claim.

### E.    Plaintiffs' Seventh Amendment Claim

Defendants argue that Plaintiffs fail to state a claim under the Seventh Amendment because the 25% fee imposed when HRSA recouped PRF funds from Plaintiffs is not "legal damages" and therefore does not trigger the right to a trial by jury. ECF No. 60-1 at 25-28.

The Seventh Amendment guarantees the right to a trial by jury in "[s]uits at common law." U.S. Const amend VII. That term as it appears in the Seventh Amendment refers not to "common law" as it is presently understood, but to "all suits which are not of equity and admiralty jurisdiction." *Curtis v. Loether*, 415 U.S. 189, 193 (1974) (quoting *Parsons v. Bedford*, 3 Pet. 433, 446-47 (1830). The Supreme Court has held that the Seventh Amendment "appl[ies] to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Id.* To determine

whether the right to a jury trial attaches, therefore, courts must consider whether a suit is legal in nature. *SEC v. Jarkesy*, 603 U.S. 109, 122-23 (2024).

Monetary relief can be legal or equitable. *Id.*at 123. "What determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to 'restore the status quo.'" *Id.* (quoting *Tull v. U.S.*, 481 U.S. 412, 422 (1987)); *see also Austin v. United States*, 509 U.S. 602, 610 (1993) ("[A] civil sanction that cannot fairly be said to serve a remedial purpose, but rather can only be explained as also serving retributive or deterrent purposes, is punishment.") (internal quotations omitted). In *Jarkesy*, the Supreme Court held a civil penalty imposed by the SEC was legal rather than equitable because the agency was required to consider several factors related to the culpability of the actor before imposing the fine or fee. *Jarkesy*, 603 U.S.. at 123-24 ("Because [the factors] tie the availability of the civil penalties to the perceived need to punish the defendant rather than to restore the victim, such considerations are legal rather than equitable."). In *Tull*, the Court found that a civil penalty imposed for Clean Water Act violations was likewise a legal remedy because the fine was not calculated "solely on the basis of equitable determinations," but rather Congress "wanted the district court to consider the need for retribution and deterrence, in addition to restitution." *Tull*, 481 U.S. at 422.

The public rights doctrine is an exception to the Seventh Amendment that permits Congress to assign to the Executive Branch matters that are not traditionally adjudicated by the judiciary. *Jarkesy*, 603 U.S. at 127 ("That exception permits Congress, under certain circumstances, to assign an action to an agency tribunal without a jury, consistent with the Seventh Amendment."). Matters that are "in the nature of an action at common law"—that is, "matters concerning private rights"— may not be exempted from Article III adjudication. *Id.* (citing *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 284, 15 L.Ed. 372 (1856); *Stern*, 564 U.S. at 484). Enforcement

related to revenue collection, immigration, foreign commerce, and fair competition, among others, have been found to fall within the "public rights" exception to the Seventh Amendment. *See Murray's Lessee*, How. at 274-75 (permitting action related to revenue collection); *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339-40 (1909) (permitting civil fines against aliens who violated a prohibition on entering the U.S. while afflicted with contagious diseases); *Ex parte Bakelite Corp.*, 279 U.S. 438, 446 (1929) (permitting tariffs imposed to produce fair competition).

Plaintiffs allege in their complaint that "imposition of the 25% Civil Penalty by agency fiat through an internal agency decision, unsupported by Congressional authority and without notice, hearing, or opportunity to be heard or appeal [*sic*] flies in the face of our most sacred Constitutional protections and cannot stand." ECF No. 55 at 41.

Defendants assert that the 25% fee was imposed pursuant to 31 U.S.C. § 3711 *et seq.* to recover the costs to the Treasury associated with collecting debts on behalf of other agencies. Under 31 U.S.C. § 3711:

> Any agency operating a debt collection center to which nontax claims are referred or transferred under this subsection may charge a fee sufficient to cover the full cost of implementing this subsection. The agency transferring or referring the nontax claim shall be charged the fee, and the agency charging the fee shall collect such fee by retaining the amount of the fee from amounts collected pursuant to this subsection . . . Amounts charged under this subsection concerning delinquent claims may be considered as costs pursuant to [31 U.S.C. § 3717(e)].

31 U.S.C. § 3711(g)(6). Under 31 U.S.C. § 3717(e), "[t]he head of an executive, judicial, or legislative agency shall assess on a claim owed by a person a charge to cover the cost of processing and handling a delinquent claim." 31 U.S.C. § 3717(e)(1).

Defendants argue that the 25% charge arises from the Treasury's fees "to cover the government's losses associated with the processing and handling of delinquent debt." ECF No. 60-1 at 27. The fees are imposed without consideration of the debtor's culpability and are not intended for deterrence or punishment. Therefore, Defendants argue, the fee should be considered

"equitable damages" rather than "legal damages," and the right to a jury trial does not attach. Defendants also argue that PRF recoupment falls within the "public rights" exception to the Seventh Amendment: "Congress has the power, under Article I, to authorize an agency administering a complex regulatory scheme to allocate costs and benefits among voluntary participants in the program without providing an Article III adjudication." *Id.* at 28 (quoting *Thomas v. Union Carbide*, 473 U.S. 568, 570 (1985)). Defendants argue that PRF recoupment, which HRSA undertook pursuant to its authority under the CARES Act to distribute PRF funds quickly while "ensuring compliance with the conditions of payment," is the type of action contemplated by the public rights doctrine. They assert that the categories recognized by the Supreme Court under this doctrine (i.e., taxation, public lands, public health, and public benefits) demonstrate that the exception applies to grant the government "flexibility to protect the disposition and use of its property and funds, without the need for a jury or an Article III court proceeding." *Id.*

> Plaintiffs' response provides that,
>
> [w]hile initially the Plaintiffs alleged a Seventh Amendment Claim based on the 25% Civil Penalty and the US Supreme Court's ruling in SEC v. Jerkesy, the Defendants' Memorandum of Law submitted herein when read in conjunction with the Second Amended Complaint provides an additional and more direct violation thereof ."

ECF No. 63 at 21. Plaintiffs proceed to plead a Seventh Amendment claim under the theory that a contract existed between Plaintiffs and Defendants, and the PRF recoupment and 25% fee was an attempt "to adjudicate a breach of contract claim administratively." *Id.* at 22. They restate their argument that the "public rights" exception is inapplicable to the Civil Penalty "both for the reasons stated by the Court in Jarkesy . . . and because the mechanism employed by HHS/HRSA to impose the civil penalty was not assigned by Congress to an agency to determine without a jury for decision." ECF Nos. 55 at 39-41 & ECF No. 63 at 22-24. Plaintiffs do not respond to any of

the arguments raised in the Motion that the Seventh Amendment does not attach or that the "public rights" exception does not apply. Nor do Plaintiffs acknowledge the statutory scheme under which HRSA was required to impose a fee to cover the Treasury's administrative costs.

As previously stated, Plaintiffs cannot amend their Complaint in opposition to a motion to dismiss. *Mylan Lab'ys, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101 (7th Cir. 1984); *Zachair, Ltd. V. Driggs*, 965 F. Supp. 741, 749 n. 4 (D. Md. 1997) ("[Plaintiff] is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint.")). The complaint did not allege that Plaintiffs were entitled to a jury trial on the theory that Defendants were enforcing a contract. Plaintiffs' Seventh Amendment claim based on breach of contract, therefore, will not be considered.

Plaintiffs fail to make any plausible argument that the recoupment or 25% fee was imposed to punish or deter rather than to "restore the status quo." I find that these costs were equitable rather than legal, and the Seventh Amendment right to a jury trial does not attach. And even if the Seventh Amendment's protections were triggered, Plaintiffs do not articulate any reason that the civil fee or clawbacks are distinguishable from the categories of actions that the Supreme Court has held are covered by the "public rights" doctrine, such as revenue collection or public benefits.

For these reasons, Defendants' Motion is granted as to Plaintiffs' Seventh Amendment claim (Count VI).

**F.    Plaintiffs' Appointments Clause Claim**

Defendants argue that Plaintiffs fail to state a plausible claim for violation of the Appointments Clause. ECF No. 60-1 at 29.

The Appointments Clause establishes two tiers of federal officers: (1) principal officers, whose appointment "requires a nomination by the President and confirmation by the Senate"; and (2) inferior officers, whose appointment may be vested by Congress "in the President along, in the courts of law, or in the heads of departments." *Buckley v. Valeo*, 424 U.S. 1, 125 (1976); U.S. Const., art. II § 2, cl. 2. An inferior officer's "work is directed and supervised at some level by others who were appointed by presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663-63 (1997). The Supreme Court has held that, where an officer who was not appointed by the President and confirmed by Congress wields power to render unreviewable decisions and has removal protections that take them outside of the supervision of a superior officer, that officer is either a principal officer who was not properly appointed or else an inferior officer who holds power that is incompatible with his position. *United States v. Arthrex*, 594 U.S. 1, 23 (2021). In either case, it follows that such power in the hands of a person who was not appointed by the President and confirmed by the Senate is unconstitutional. *Id.* The Supreme Court has cured such defects by making the officer's decisions reviewable by a principal officer, thus restoring the position to that of an inferior officer. *Id.* at 26

HRSA (which is part of the Public Health Service) is a component of the HHS. Reorganization Plan No. 3 of 1966, 5 U.S.C. app. 1 ("[T]here are hereby transferred to the Secretary of Health, Education, and Welfare [now the Department of Health and Human Services and the Department of Education]. . . all functions of the Public Health Service, all . . . officers and employees of the Public Health Service, and all functions of all agencies of or in the Public Health Service."). The HRSA is led by the Administrator of the HRSA and subject to the authority of the HHS. 42 U.S.C. § 202 ("The Public Health Service in the Department of Health and Human Services shall be administered by the Assistant Secretary for Health under the supervision and

direction of the Secretary."). The Secretary of HHS and the Assistant Secretary of HHS are both principal officers who are appointed by the President and confirmed by the Senate. Reorganization Plan No. 1 of 1953, 5 U.S.C. app. 1 (creating the position of Secretary of the Department of Health Education and Welfare, who will be appointed by the President and confirmed by the Senate); 42 U.S.C. § 3502 (requiring Presidential appointment and Senate confirmation of the Assistant Secretary of HHS).

Plaintiffs' Appointments Clause claim relies on *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930 (5th Cir. 2024), where Plaintiffs argue that the Fifth Circuit "determined that the Administrator of HRSA was a principal officer under the Appointments Clause . . . who must be nominated by the President and confirmed by the Senate." ECF No. 55 ¶ 191. Defendants argue that Plaintiffs misread *Braidwood*.

In *Braidwood*, the plaintiffs challenged preventative care recommendations and guidelines that were issued by three administrative bodies: the Preventative Services Task Force ("PSTF"), the Advisory Committee on Immunization Practices, and HRSA. *Braidwood*, 104 F.4th at 937. The Fifth Circuit held that the members of the PSTF were principal officers because the HHS Secretary lacked direct authority to influence PSTF's decisions. *Id.* at 944. Because the PSTF members were not nominated by the President and confirmed by the Senate, their positions were unconstitutional and PSTF agency action was unlawful. *Id.* at 944-45. The Fifth Circuit noted that HRSA also had "unilateral authority to issue legally binding recommendations" under the preventative-care scheme at issue, subject only to the HHS Secretary's 'interval' determination under subsection (b)." *Id.* at 955 (citing 42 U.S.C. § 300gg-13). However, the Court also acknowledged that "Secretary Becerra can exercise control over the guidelines [HRSA] publishes by virtue of the transfer of power in HHS's Reorganization Plan No. 3 of 1966 . . . Thus, unlike

his power vis-à-vis that Task Force, Secretary Becerra has fallback powers on which he can exercise supervisory authority over . . . HRSA." *Id.* at 956. But, the Fifth Circuit held, the Secretary had failed to effectively ratify HRSA's recommendation with respect to the preventative care guidelines. *Id.* at 957.

However, on June 27, 2025, the United States Supreme Court reversed the Fifth Circuit's holding in *Braidwood.* The Court only considered the issues of whether PSTF members were principal or inferior officers and whether the PSTF members were properly appointed under the Appointments Clause. The Court held that PSTF members "are inferior officers because their work is 'directed and supervised' by the Secretary of HHS, a principal officer." They held that PSTF members are inferior officers because "an officer . . . who is removable at will by a principal officer . . . typically qualifies as an inferior officer." *10. And "[r]egardless of whether the Secretary's authority to remove [PSTF] members at will suffices on its own to render them inferior officers, the Secretary also has statutory power to directly review and block [PSTF] recommendations before they take effect." *Id.* *13.

The Supreme Court's ruling in *Braidwood* controls here. HRSA is part of the HHS and the Administrator is subject to the authority of HHS and the Secretary. Plaintiffs do not allege that HRSA was not subject to the Secretary's supervision either generally or specifically pertaining to the PRF Terms and Conditions, reporting requirements, or recoupment action. And they do not argue that the Administrator of the HRSA was protected against removal by the Secretary. *Id.* Plaintiffs fail to plausibly show that the Administrator is a principal officer. Therefore Count VII will be dismissed.

G.    **Treasury Defendants**

Finally, Defendants argue that the Treasury Defendants (i.e., Treasury, Treasury Secretary, CRS, and Sanders) are not proper parties to this lawsuit because the Treasury's role was ministerial and non-discretionary. ECF No. 60-1 at 31.

Under federal law, federal agencies are required to certify nontax debts to the Treasury for collection. 31 U.S.C. § 3711(g)(1); 31 C.F.R. § 285.12(c)(2). Under the Treasury Offset Program, federal agencies must determine whether debts owed to them are eligible for collection by offset. 31 U.S.C. § 3716(c)(1)(A). Courts have held that when the Treasury performs its non-discretionary duty to offset debt certified by other agencies, the Treasury is not the proper agency to be named as a Defendant in any suit challenging the offset. *Johnson v. U.S. Dep't of Treasury*, 469 Fed. Appx. 79, 81 (3d Cir. 2012) ( "The District Court correctly determined that the Treasury Department's actions with respect to an offset are not subject to judicial review."); *Johnson v. U.S. Dep't of Treasury*, 300 Fed. Appx. 860, 862 (11th Cir. 2008) (unpublished) ("[The] Treasury [has] no statutory authority over the debt, nor any role in determining whether or not the debt [is] valid or whether [the benefit] should be offset.") (citing 31 U.S.C. Sect. 3716(c)(1)(A); 31 C.F.R. Sect. 285.5(d)(6)). "[I]t is the creditor agency, not the disbursing agency, that is required to ensure that the debtor receives due process under the law." *Id.* (citing 31 U.S.C. Sect. 3716(a)); *see also Hughes v. United States*, No. 14-998, 2015 WL 447961, at *3 (E.D. La. July 22, 2015).

Plaintiffs failed to respond to Defendants' argument that the Treasury Defendants are not proper parties to the suit. The Court treats this lack of response as an abandonment of Plaintiffs' claims against those Defendants. *See Garnes v. Maryland*, No. RDB-17-1430, 2018 WL 276425 at *3 (Jan. 3, 2018) ("[B]y not responding to all of the arguments raised in its Motion to Dismiss, Plaintiff abandoned any opposition to those arguments."); *Ferdinand-Davenport v. Children's*

*Guild*, 742 F. Supp. 742, 777 (D. Md. 2010) (holding that the plaintiff abandoned her claim by failing to address the defendant's arguments against it in her response to the defendant's motion to dismiss for failure to state a claim). All claims against the Treasury, the Treasury Secretary, and CRS are therefore dismissed with prejudice.

## IV.    Conclusion

For the reasons stated above, Defendants' Motion to Dismiss will be **GRANTED IN PART** and **DENIED IN PART**.

1.    The Motion is **GRANTED** as to Plaintiff's claims arising under the APA (Counts III, IV,[12] and V), the Seventh Amendment (Count VI), and the Appointments Clause (Count VII).

2.    The Motion is **DENIED** as to Plaintiffs' Procedural Due Process claim (Count I).[13]

3.    The Motion to dismiss Treasury Defendants is **GRANTED**.

Counts I and II will proceed against Defendants HHS, Robert F. Kennedy, Jr., HRSA, Carole Johnson, John Doe 1-10, and Jane Doe 1-10.

Within 21 days from the date of this Memorandum Opinion, Defendants shall file an answer to the Second Amended Complaint. Within 28 days of the date of this Memorandum Opinion, the parties shall file a joint status report stating (1) whether they wish to participate in an early settlement conference with another magistrate judge, and (2) whether they wish for the Court to enter a scheduling order at this time.

---

[12] Plaintiffs identified two claims in their Complaint as "Count IV." ECF No. 55 at 32-33. Both make out claims arising under the APA and the Court finds that neither states a plausible claim for relief. They are both dismissed.

[13] Count II states a claim for "Declaratory Relief." The Court will assume that Count II is a prayer for relief mislabeled as a claim. Nothing in this Opinion will foreclose Plaintiffs' requested declaration of their rights with respect to this controversy if they prevail.

July 2, 2025                              /s/
Date                                     Timothy J. Sullivan
                                         Chief United States Magistrate Judge